**In re COLUMBIA SECURITIES LITIGATION.**

No. 89 Civ. 6821 (LBS).

United States District Court,
S.D. New York.

May 19, 1994.

Lowey Dannenberg Bemporad & Selinger, P.C., New York City (Richard Bemporad, David C. Harrison, of counsel), for plaintiffs.

Skadden, Arps, Slate, Meagher & Flom, New York City (Henry P. Wasserstein, Joseph Guglielmelli, of counsel), for defendants Sony Corp. and Sony USA, Inc.

Rosenman & Colin, New York City (Joel W. Sternman, of counsel), for defendant Michael P. Schulhof.

SAND, District Judge.

This consolidated securities fraud action arises out of the September 1989 acquisition of Columbia Pictures Entertainment, Inc. ("Columbia") by Sony USA, Inc. ("Sony USA"), a wholly owned subsidiary of the Sony Corporation ("Sony Japan"; referred to herein, collectively with Sony USA, as "Sony"). Plaintiffs are former stockholders of Columbia who seek to maintain a class action on behalf of all persons who sold shares of Columbia common stock or call options between March 27 and September 23, 1989 (the "Class Period"), a period immediately preceding Sony USA's acquisition of Columbia. Defendants are Sony USA, Sony Japan, and Michael Schulhof, Chairman and President of Sony USA and a director of both Sony USA and Sony Japan.

Plaintiffs seek relief under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1993), and Rule 10b–5 pro-

mulgated thereunder, 17 C.F.R. § 240.10b–5. They allege that, during the Class Period, defendants made statements to the press, which were reported in two news articles (the "Press Reports")—the first published in *Forbes,* the second distributed by the Reuters news service and appearing in The New York Times—in which defendants falsely denied that they were in merger negotiations with Columbia. These denials, plaintiffs claim, constituted materially false and misleading statements, actionable under Rule 10b–5, which depressed the market price of Columbia stock, causing plaintiffs to sell their Columbia stock at less than its actual worth.

By Opinion dated September 26, 1990, 747 F.Supp. 237, we denied defendants' motion to dismiss plaintiffs' amended complaint. Following that ruling and subsequent initial discovery, plaintiffs filed a Second Consolidated Amended and Supplemented Class Action Complaint (the "Complaint"), and the parties conducted extensive discovery. Defendants now move for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure. They contend that plaintiffs have failed to produce evidence sufficient to establish four of the elements required in a 10b–5 action: a misstatement or omission, scienter, reliance, and materiality. For the reasons set forth below, defendants' motion is denied.[1]

### BACKGROUND

The parties have submitted more than 3,000 pages of briefs, transcripts, and exhibits, contesting every nuance of the Press Reports and of the events which led up to Sony USA's acquisition of Columbia. The essential facts, however, may be set out at far less length. Resolving all ambiguities and drawing all reasonable inferences in favor of plaintiffs, as we must do on defendants' motion for summary judgment, *Eastman Kodak Co. v. Image Technical Services, Inc.,* —— U.S. ——, —— – ——, 112 S.Ct. 2072, 2076–77, 119 L.Ed.2d 265 (1992), *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), the essential facts are as follows.

Defendant Sony Japan is a Japanese corporation that is one of the world's leading manufacturers of audio and visual, television, computer, and electronic equipment. Sony Japan is publicly owned, and its shares are traded on the Tokyo Stock Exchange and on the New York Stock Exchange in the form of American depositary shares. For the year ended March 31, 1989, Sony Japan's net sales exceeded $16 billion, and its net income exceeded $549 million.

Defendant Sony USA is a New York corporation and the largest overseas subsidiary of Sony Japan. Defendant Schulhof has been a Director of Sony USA or its predecessor corporation, Sony Corporation of America, since 1978, and Chairman and President of Sony USA since September 1989. From March 1988 until his promotion to President in September 1989, Schulhof was the Deputy President of Sony USA. As Deputy President, Schulhof was substantially involved in negotiations that led to Sony USA's acquisition of Columbia.

Columbia, a Delaware corporation that maintained its principal executive offices in New York City, was one of America's preeminent movie studios; its principal business consisted of the production, world-wide distribution, and exploitation of motion pictures and television programs. As of August 31, 1989, Columbia had approximately 127 million shares of common stock outstanding on a fully diluted basis, which were traded on the New York Stock Exchange. In addition, option contracts (warrants) to acquire shares of Columbia common stock were outstanding and actively traded during the Class Period on the American Stock Exchange. During the Class Period, the Coca–Cola Company ("Coca–Cola"), a Delaware corporation, owned approximately 49 percent of Columbia's outstanding common stock. Columbia common stock traded in the $18 to $21 per share range during most of the Class Period.

During the 1980s, Sony and its subsidiaries began to study possibilities of expansion into new areas of the entertainment industry.

---

1. We will consider in a separate opinion or order plaintiffs' motion to compel discovery of documents withheld by defendants as privileged attorney-client communications.

Specifically, Sony sought to acquire companies which marketed products that could be used with Sony's television, video, and other entertainment equipment. During 1987, 1988, and 1989, Sony studied possible investments in motion picture and television production studios, and talked with several motion picture studios regarding possible relationships. As part of that program, Sony acquired CBS Records from CBS, Inc. in January 1988. During 1988, Sony began preparations to acquire a major motion picture and television production studio, or a library of motion picture films. In connection with that effort, defendant Schulhof and other Sony executives met with executives from several major motion picture studios, including Columbia, concerning the possibility of an acquisition.

To facilitate these efforts, Sony retained the services of The Blackstone Group ("Blackstone"). Blackstone, which had served as Sony's financial advisor in the acquisition of CBS Records, provided Sony with information and analysis of the motion picture industry and of Columbia in particular; its preliminary report on Columbia, analyzing the value of the movie studio as an acquisition candidate, was issued in August 1988 and supplemented with several updates as negotiations between Sony and Columbia developed.

The prospect of Sony acquiring Columbia, or Coca–Cola's equity interest in Columbia, was raised by Schulhof at a meeting in November 1988 with Victor Kaufman, Columbia's President and CEO. Kaufman subsequently consulted with the two other Columbia executives who, with him, constituted Columbia's Executive Committee—Donald R. Keough, Columbia's Chairman of the Board (and President of Coca–Cola), and Herbert A. Allen, a former Chairman of the Columbia Board of Directors and a director and major stockholder of both Columbia and Coca–Cola. Columbia then retained Allen's investment banking firm, Allen & Co., to represent Columbia and Coca–Cola in negotiations with Sony. A meeting was arranged among Kaufman, Allen, and Schulhof to establish the "ground rules" under which the negotiations regarding the sale of Columbia would proceed. At that meeting, Kaufman informed Schulhof that Allen would be representing Columbia in the negotiations and that Schulhof should deal with Allen in that capacity.

Following that November 1988 meeting, Schulhof arranged for senior executives of Blackstone to meet with Allen and other Allen & Co. representatives to assess the prospect of acquiring Columbia. In December 1988 and January 1989, Schulhof attended a series of meetings on the possible acquisition of Columbia (code-named "Project Challenger")—some of these in Tokyo with senior executives of Sony Japan, including Sony Japan President Norio Ohga (who became Sony Japan CEO in June 1989 and who took charge of Sony's plans regarding the motion picture industry), and others with top representatives of Allen & Co., Blackstone, Columbia, and Coca–Cola. The prospect of Columbia's acquisition was not reported to Columbia's full board because, as Kaufman testified in a different proceeding, "we always believed that transactions of great sensitivity was [sic] best dealt with with as few people having knowledge of the potential nature of that transaction as possible." (Pls.' App. 324.) [2]

On February 7, 1989, the Sony Japan Executive Committee held a meeting at which the topic of beginning negotiations (or "discussions," depending on the translation from the Japanese) regarding the acquisition of Columbia was raised. The next day, the Sony Japan Executive Committee authorized Schulhof to make Allen an informal $18–per–share offer for Columbia, representing a premium of approximately 20 to 30 percent above the price at which Columbia shares

---

2. "Pls.' App." refers to Appendix to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. The parties' other briefs and supporting papers are abbreviated as follows: Appendix to Defendants' Motion for Summary Judgment ("Defs.' App."); Defendants' Memorandum of Law in Support of their Motion for Summary Judgment ("Defs.' Mem."); Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pls.' Mem."); Defendants' Reply Memorandum of Law in Support of their Motion for Summary Judgment ("Defs.' Reply Mem.").

were then trading.[3] Schulhof communicated the $18–per–share figure to Allen in February 1989, to which Allen responded that Columbia was worth at least $26 per share. Shortly thereafter, Sony Japan President Ohga authorized Schulhof to communicate a $20–per–share proposal to Allen, which Schulhof did.

The parties dispute the extent of Sony's involvement in Project Challenger between February and mid-May 1989. This period is crucial in that it encompasses the date of the first of the two Press Reports at issue in this action, in which Sony representatives were reported as denying the existence of negotiations with Columbia. The first Press Report was an article on Columbia, entitled "Through the Looking Glass," which appeared in the April 3, 1989 issue of *Forbes* (available to the general public on March 20). The one-page article, by veteran financial reporter Lisa Gubernick, contrasted Columbia CEO Kaufman's optimistic assessment of Columbia's immediate prospects with the reporter's rather gloomy assessment of those prospects. The article noted that, despite Columbia's disappointing recent performance, Columbia stock had doubled in price in the previous year, driven by speculation about a possible takeover. The article stated:

> In order to take control of Columbia Pictures, an acquisitor would likely buy Coca–Cola's 49% stake, plus the roughly 3% owned by investor Herbert Allen.... [B]oth the names at the top of everyone's list of grand acquisitors, *Sony and Tele-Communications, Inc.*, the cable TV folks, *deny in strong terms that they're talking to either Columbia or Coca–Cola.*

(Emphasis added).

This last statement, according to Gubernick's testimony and notes, was based on a telephone interview with Schulhof in late February or early March. Defendants contest that Schulhof ever made such a statement. Additionally, they assert that Project

Challenger was "on hold" at the time Gubernick talked to Schulhof, so that even if Schulhof did make such a statement, it was not materially false. They assert that no activities regarding Project Challenger took place at Sony's Tokyo headquarters between mid-February and mid-May, while Ohga recovered from a heart attack that he suffered in late March. Plaintiffs dispute this characterization, and present evidence of some Columbia-related activity in Tokyo during this period. Additionally, they present evidence that activities relating to the Columbia acquisition continued in the United States, including the preparation of updated studies by Blackstone, and meetings between Schulhof and representatives of Allen & Co. and Blackstone.

The next disputed period is that preceding and following June 21, the date of the second Press Report, a Reuters news release in which Sony was reported as denying any interest in acquiring a United States movie studio. Plaintiffs have presented overwhelming evidence of high-level negotiations throughout this period. On May 23, 1989, Sony executives in Tokyo made a formal presentation on Project Challenger to Sony Japan President Ohga and other senior Sony executives. The following week, Ohga traveled to the United States and participated in meetings on Project Challenger with officials of Sony USA and Blackstone. From June 14 to 16, senior officers and directors of Sony Japan and Sony USA convened in Tokyo for high-level strategy meetings on Project Challenger. On June 20, Ohga convened a Sony Japan Executive Committee meeting in Tokyo, at which a decision was made to commence negotiations to purchase Coca–Cola's shares of Columbia at $26 per share.

On June 20—the day before Schulhof spoke to Reuters and was quoted as saying that "there's nothing on the table" between Sony and any movie studio—Schulhof spoke with Allen and offered $24.50 per share for Columbia. At a face-to-face meeting on the morning of June 21, 1989, Allen responded

---

**3.** Plaintiffs characterize the $18–per–share figure as an "offer." Defendants dispute this characterization, deeming it instead a mere "indication" of Sony's willingness to consider an acquisition at that price. As we are bound to draw all reasonable inferences in favor of the non-movants in this summary judgment motion, we adopt plaintiffs' characterization for purposes of this motion.

with three counterproposals involving cash and securities.[4] Later that day, Sony and Blackstone representatives met in New York to evaluate Allen's counterproposals and to formulate Sony's negotiating strategy. On the following day, June 22, Ohga and other senior Sony executives met in Tokyo and determined that Schulhof should convey to Columbia an all-cash buyout proposal of $25.50 per share.

The Reuters Press Report appeared on June 21. Captioned "Sony Says It Not Actively Seeking Studios," it stated in full:

> Sony Corp. said it is not seeking to acquire a U.S. movie studio, despite recent market rumors it is interested in Warner Communications, Paramount Communications Inc. or Columbia Pictures Entertainment.
>
> "There's nothing on the table," said Michael Schulhof, vice chairman of Sony Corp. of America and the first U.S. director of Sony Corp. Schulhof, rumored to have been spearheading such an effort, told Reuters he would be personally involved "with anything that we might do, but we are not currently doing anything."
>
> Sony Corp. has long been rumored to be interested in buying a U.S. film studio to gain a share of expected new markets for creative entertainment and last fall it acknowledged having talked to MGM/UA Communications Co. Quintex of Australia Ltd. agreed to buy MGM/UA in April.
>
> Sony Corp. of America chairman Masaaki Morita said then that the company held talks with several studios but had broken off all negotiations. He also said it would be more difficult for Sony to buy a studio than it had been to acquire CBS Inc.'s records division last year after 20 years of collaboration.

The Reuters release was pieced together from two sources. The source of the first two paragraphs was an interview of Schulhof conducted by Reuters reporter Samuel Perry on June 21, 1989, the day of the release.

The second two paragraphs repeated in substance a Reuters release of two-and-a-half months earlier, based on an April 4, 1989 interview of Morita conducted by another Reuters reporter, Samuel Fromartz.

The first paragraph of the Reuters release was carried essentially verbatim as a news brief in The New York Times the following day, June 22. On that day and the following day, Sony public relations managers who were present at the June 21 press conference circulated memoranda to senior executives of Sony Japan and Sony USA confirming the accuracy of the Reuters release.

Additional meetings regarding the Columbia acquisition were held in the following days between Sony representatives and their financial and legal advisors, and with Allen (representing Columbia); around this time, Sony's legal counsel drafted proposed acquisition documents. On June 27, Schulhof made an all-cash offer of $25 per share to Allen. At a July 6 meeting between Schulhof and Allen, the two discussed the steps necessary to "prevent [the transaction] from becoming public." (Pls.' App. 879–80.) Various acquisition-related activities continued through September 1989.

On September 22, 1989, Schulhof communicated to Allen Sony's desire to make a formal offer in the $26 to $28–per–share range to acquire all outstanding Columbia shares, and he requested a meeting of the Columbia Board of Directors to consider the buyout proposal. Before the stock market opened on September 25, Columbia issued a brief press release disclosing that it was involved in buyout talks, but not disclosing the identity of the prospective acquiror or the price range of the proposed acquisition (the "Press Release"). The Press Release, which was captioned "COLUMBIA PICTURES ENTERTAINMENT, INC. INDICATES DISCUSSIONS REGARDING SALE OF COMPANY," announced in its entirety:

> Columbia Pictures Entertainment, Inc. announced today that it is engaged in discus-

---

4. Despite a Sony USA internal memorandum characterizing these as "offers" and "counterproposals," defendants deny that "offers" and "counterproposals" were made. They instead characterize what transpired as "suggestions" of ways to structure a possible transaction. Defs.' 3(g) St. ¶¶ 53–56. Given the summary judgment posture of this case, *see* footnote 2 *supra*, we resolve these disputed inferences in favor of plaintiffs, again for purposes of this motion only.

sions with a third party involving the acquisition for cash of all of Columbia's outstanding shares. The Board of Directors of Columbia will be meeting this evening to review the status of the discussions.

The price of Columbia common stock soared 25 percent upon this announcement—from a closing price of $21.125 on September 22 (the last day of trading before the Press Release) to a closing price of $26.375 on September 25.

On September 27, 1989, Sony USA, Columbia, and a Sony USA affiliate formed for the purpose, Sony Columbia Acquisition Corp. ("Sony Acquisition"), entered into a merger agreement by which Sony was to commence a tender offer to purchase all outstanding shares of Columbia common stock at $27 per share, as well as all outstanding warrants. The Coca–Cola Board of Directors approved the buyout on October 2, and on October 3 Sony USA, acting through Sony Acquisition, commenced the tender offer. Sony completed the acquisition by early November 1989 by merging Sony Acquisition with Columbia in a short-form merger. The $27-per-share price constituted a premium of more than 70 percent over the price at which members of the plaintiff class sold their shares following publication of the *Forbes* article the previous March, and a 28 percent premium over the price at which Columbia common stock closed on September 22, 1989, the last day of trading before the Press Release.

## DISCUSSION

 As this Court stated in its previous Opinion in this action, a plaintiff must demonstrate the existence of the following six elements in order to state a cause of action under Rule 10b–5:

(1) a misstatement or omission by the defendant; (2) as to a material fact; (3) plaintiff relied on the misstatement or omission; (4) defendant acted with scienter; (5) the misstatement or omission was made in connection with the purchase or sale of securities; and (6) plaintiff suffered damage as a result of the misstatement or omission.

*In re Columbia Sec. Litig.*, 747 F.Supp. 237, 240–41 (S.D.N.Y. 1990); *see also Burke v. Jacoby*, 981 F.2d 1372, 1378 (2d Cir.1992).

Defendants focus their attack on the first four of these elements (in rearranged order)—misstatement, scienter, reliance, and materiality. In brief, they argue as follows: 1) plaintiffs' argument that defendants made misleading statements is based on inadmissible hearsay and collapses when this evidence is excluded; 2) even if defendants misspoke, at worst they did so negligently; any misstatements they might have made did not rise to the level of intentional or reckless misconduct that comprises scienter; 3) the presumption that plaintiffs relied on the integrity of the market is rebutted by evidence that the Press Reports had no significant effect on the price of Columbia stock; and 4) the "indicia of interest" in a possible acquisition of Columbia were not sufficiently advanced at the time of the Press Reports as to render defendants' denials materially misleading.

We will discuss each of these arguments in turn below. As set out below, we conclude that defendants have not met their burden of demonstrating a lack of genuine issues of fact on any one of these elements.

### Standard on Summary Judgment

Summary judgment is appropriate where there is "no genuine issue as to any material fact" and the moving party is entitled to "judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must view the facts in the light most favorable to the non-moving party, and must resolve all ambiguities and draw all inferences against the moving party. *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991). In determining whether to grant a motion for summary judgment, the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of establishing the absence of a material issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). However, if the non-moving party would bear the burden of proof on a claim at trial—as plaintiffs would in this

case—the moving party may satisfy its burden by demonstrating an absence of evidence to support an essential element of such a claim. *Id.* at 325, 106 S.Ct. at 2554. To defeat the motion, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986), but instead must point to evidence sufficient to establish each element of its case, *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552— evidence, that is, such that a reasonable jury could return a verdict for the non-moving party on that element. *Liberty Lobby*, 477 U.S. at 248–49, 106 S.Ct. at 2510; *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir.1992).

## I. *SONY'S MISSTATEMENTS: ADMISSIBILITY OF THE PRESS REPORTS*

The April 3, 1989 *Forbes* article and the June 21, 1989 Reuters release together comprise the heart of plaintiffs' case that defendants misled the investing public about the prospect of a Sony acquisition of Columbia. Defendants contend that these two Press Reports, along with various accompanying notes and memoranda, constitute inadmissible hearsay, and that when they are excluded, plaintiffs cannot sustain their burden of demonstrating that misstatements were made.

Plaintiffs do not contest that the Press Reports are hearsay. They fall clearly within the definition of hearsay set out by Fed. R.Evid. 801(c)—they are out-of-court statements offered to prove the truth of the matter asserted, *i.e.*, that Schulhof and other corporate representatives made certain statements. (The fact that the Press Reports themselves report the content of Schulhof's statements does not make them double hearsay, however; Schulhof's statements are offered not for the truth of the matter asserted but instead as verbal acts—that is, they are not offered to prove that there was "nothing on the table" between Sony and Columbia, but rather to support plaintiffs' case that certain statements by Sony representatives entered the market.) Thus, the relevant question is whether the Press Reports, as

plaintiffs contend, fall within one of the hearsay rule's many exceptions, in particular the "residual" exception, Federal Rule of Evidence 803(24). If they do not, they may not be considered on a motion for summary judgment. *See Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 924 (2d Cir.1985) (inadmissible hearsay may not be considered on summary judgment motion absent a showing that admissible evidence will be available at trial).

We consider the admissibility issue below as it applies to each of the two Press Reports in turn. Before doing so, however, we consider briefly the general hearsay status of news articles and the requirements of Rule 803(24), the "residual exception" to the hearsay rule that provides the chief avenue for their admission.

### A. *News Articles as Hearsay, And Rule 803(24)*

Often, when offered to prove that certain statements were made, newspaper and magazine articles are held inadmissible as hearsay. *See May v. Cooperman*, 780 F.2d 240, 262 n. 10 (3d Cir.1985) (Becker, J., dissenting on other grounds). However, Federal Rule of Evidence 803(24), the "residual" or "catchall" exception to the hearsay rule, provides a mechanism by which they may sometimes be admitted. The section reads, in pertinent part, as follows:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (24) *Other exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed.R.Evid. 803(24); *and see Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991).

The legislative history of this rule indicates that it should be applied sparingly. *See Robinson v. Shapiro*, 646 F.2d 734, 742 (2d Cir.1981). But the trial court has broad discretion in assessing the probity and trustworthiness of evidence. *SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1225 (D.C.Cir.1989); 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 803(24)[01], at 803–374 (1993). Although Rule 803(24) lists probativity and trustworthiness as separate requirements, the two requirements must be considered as linked. In essence, the task of the Court, in assessing whether a certain piece of evidence may be admitted under 803(24), is to balance the need for the evidence, in light of other available evidence, against its trustworthiness, assessed in light of the surrounding circumstances. 4 *Weinstein's Evidence* ¶ 803(24)[01], at 803–374 & n. 18. Courts have been willing to admit hearsay evidence under 803(24) when the declarant is available and subject to cross-examination and the hearsay statement in question was not the product of faulty perception, memory or meaning, the dangers against which the hearsay rule seeks to guard. 4 *Weinstein's Evidence* ¶ 803(24)[01], at 803–375 & n. 21; *and see Parsons*, 929 F.2d at 907; *Robinson*, 646 F.2d at 742; *Sherrell Perfumers, Inc. v. Revlon, Inc.*, 524 F.Supp. 302 (S.D.N.Y.1980).

News accounts, unsupported by corroborating evidence and offered to prove that certain statements were made, will usually lack the "circumstantial guarantees of trustworthiness" that Rule 803(24) requires. *See Larez v. City of Los Angeles*, 946 F.2d 630, 642–43 (9th Cir.1991); *May v. Cooperman*, 780 F.2d 240, 263 (3d Cir.1985) (Becker, J., dissenting on other grounds); *United States Football League v. NFL*, 1986–1 Trade Cas. (CCH) ¶ 67,101, at 62,667–69, 1986 WL 5803 (S.D.N.Y.1986). Courts admitting evidence under 803(24) require some showing that the declarant's perception, memory, narration, or sincerity are reliable. *May*, 780 F.2d at 263. Unsupported newspaper articles will normally fail on all of these

grounds: Unless their author is available for cross-examination, newspapers stories generally will present a blank face that gives little clue as to the reliability of the reporter's perception, memory, narration, or sincerity, and in addition fails to disclose how the article was changed in the editing process. *Id.* Newspaper and magazine articles, however, may nevertheless be introduced into evidence if they are bolstered by supporting evidence that confers some circumstantial guarantees of trustworthiness upon them. *See, e.g., Larez*, 946 F.2d at 643 & n. 6 (finding "circumstantial guarantees of trustworthiness" requirement met when three independent newspapers attributed similar quotations to defendant, who testified; nevertheless, excluding the articles as not "best evidence" under 803(24)(B)).

### B. *The Forbes Article*

The admissibility of the *Forbes* article turns on a somewhat atypical set of circumstances. Unlike many other cases in which newspaper articles are sought to be introduced, the reporter who wrote the article, Lisa Gubernick, is available to testify; additionally, she has contemporary notes of the telephone interview with Schulhof which provides the basis for the article. Gubernick's recollection of the conversation, however, is incomplete without reference to her notes, and these notes are incomplete in a crucial respect. While Gubernick's notes provide a contemporaneous record of Schulhof's responses to her (she typed them on her computer as she talked), they do not record the questions to which those responses were given. Without the questions to lay a foundation, defendants contend, the notes of Schulhof's answers are so vague as to be meaningless. And without the notes, they assert, the whole house of cards collapses—Gubernick's testimony is so incomplete as to be useless, and the article loses the "circumstantial guarantees of trustworthiness" that the notes would have provided and which Rule 803(24) requires.

Plaintiffs respond that the *Forbes* article, along with Gubernick's notes, may be admitted under Rule 803(24) and under several other hearsay exceptions. As we find plain-

tiffs' Rule 803(24) arguments more convincing than plaintiffs' other bases for admission, we confine ourselves to those in the discussion which follows. We begin with a closer examination of the facts.

The *Forbes* Article, as noted above, did not quote Schulhof or any other Sony representative directly, but stated only that Sony "den[ies] in strong terms that they're talking to either Columbia or Coca–Cola." Schulhof testified in his deposition that he did not recall his conversation with Gubernick, or even ever having spoken to her; and that neither he nor anyone at Sony saw the *Forbes* Article prior to the filing of this action. (Defs.' App. 417–18, 420–21.) While noting that it was "possible" that he might have talked to Gubernick, he stated unequivocally that, had he done so, he would not have "issued a denial" that Sony was talking to Columbia. (Defs.' App. 418–19.)

Plaintiffs, in response, have produced fragments of the notes that Gubernick took on her computer of her conversation with Schulhof. These fragments were all that remained of Gubernick's notes following an apparent computer glitch in the course of her changing offices at *Forbes*. These notes, which Gubernick characterized as "a partial bit of incomplete notes that were used to write the Columbia Pictures story," were taken several weeks before the story came out, during a telephone conversation with Schulhof which she described as lasting no more than two or three minutes. The relevant notes, which were interrupted in midword by the computer glitch, read as follows (misspellings and word fragment in original):

> Schulopf: there's no story tehre. there's nothing happening. i don't know where the rumors caome. i honestly don't know. everybody likes to use our name, we sell nwespapers. there's no story there. we have over the past twelve months spo

Pls.' Ex. 100.

When Gubernick was deposed, she was unable to recall to what question Schulhof was responding. On direct examination by plaintiffs' counsel, she responded: "To the best of my recollection, that was the rumors regarding Sony and Columbia that were floating through Hollywood at that point."

(Defs.' App. 176.) On cross-examination, she admitted that she could not recall just what she had asked Schulhof; she characterized her efforts to reconstruct it as "real speculative." (Defs.' App. 180.) However, she testified that she was able to reconstruct what she "must have" asked Schulhof, based on her knowledge of her work habits and the context within which the interview took place: "I don't remember the substance of the conversation precisely but I would have asked if there is anything to the Sony takeover rumors in reference to that specific story of Columbia." (Defs.' App. 190–91.)

Defendants argue that Gubernick's inability to recall the question that she asked Schulhof makes her notes meaningless and the article accordingly untrustworthy and inadmissible. Defendants point out that in the nine-day period between February 27 and March 7, 1989, the approximate time period in which Gubernick spoke to Schulhof, articles published in at least seven publications or wire services reported "rampant rumors," most of which turned out to be false—for example, that Sony had completed a deal to acquire Columbia; that, after Tele–Communications Inc. had doubled Sony's offer, Sony had raised its offer; that a Columbia officer had secretly visited Tokyo in February; and that Sony would announce its acquisition of Columbia when the mourning period for the late Japanese Emperor had ended. (Defs.' Mem. at 22–23.) Defendants suggest that Schulhof could have been responding to any of these rumors rather than to a question about whether Sony was considering acquiring Columbia. Accordingly, defendants ask us to conclude that the meaning of Gubernick's notes is so ambiguous that they cannot be admitted under any of the hearsay exceptions. If Gubernick's notes cannot be admitted, they argue, neither can the resulting article, which suffers from the same defects along with the additional problem that it underwent subsequent editing by third parties before publication.

We reject defendants' argument. To begin with, Gubernick's availability to testify and be cross-examined offsets to a large degree the primary rationale for the hearsay rule—the inability to cross-examine the out-

of-court declarant. *See First City*, 890 F.2d at 1225; 4 *Weinstein's Evidence*, ¶ 803(24)[01], at 803–375. Her availability to testify distinguishes this case from others in which news stories have been found to lack trustworthiness. *E.g.*, *May*, 780 F.2d at 262–63; *United States Football League*, 1986–1 Trade Cas. (CCH) ¶ 67,101, at 62, 667–69, Additionally, in light of the fact that Gubernick was an experienced reporter at a well-regarded publication and took contemporaneous notes as she spoke to Schulhof, defendants raise no serious challenge regarding faulty perception, memory, or reporting. We also reject defendants' challenge to the article on the grounds that the initial draft no longer exists and the article as published was altered in the review and editing process. Gubernick testified that she was integrally involved in the edit process throughout and was required by *Forbes* to review the final version for accuracy. Pls.' App. 133–35, 238–39.

We conclude that, when offered together with Gubernick's testimony, Gubernick's article and accompanying notes possess the "circumstantial guarantees of trustworthiness" that Rule 803(24) requires, and that the testimony, notes, and article together provide the most probative evidence of Schulhof's alleged verbal acts. While neither the notes nor the *Forbes* article standing by themselves would possess the required degree of trustworthiness, and this problem would be only partially cured by Gubernick's incomplete testimony, the notes and article become sufficiently trustworthy to warrant admission when offered together. Each provides the needed foundation that supports the other: the notes provide the work product to back up the article, and the article provides the context that makes sense of Gubernick's incomplete notes and now-incomplete memory. In declaring that Sony "den[ies] in strong terms that they're talking to either Columbia or Coca–Cola," the article provides the information missing from Gubernick's notes—it provides a more or less contemporaneous record of Gubernick's understanding of the meaning of Schulhof's answers to her no-longer-remembered questions.[5] In laying the foundation for the notes and the article, Gubernick would be able to testify, as she did in her deposition, about her practice as a reporter and her ability to infer—based on her regular practice, the surrounding circumstances, and the article she wrote based on her notes—what questions she must have asked Schulhof.

Having concluded that the *Forbes* article and Gubernick's accompanying notes are admissible, we must reject defendants' argument that Schulhof's reported denial was not a misleading statement within the meaning of Rule 10b–5. Based on the evidence, summarized above, of acquisition-related activity at Sony and Columbia in the late winter and the spring of 1989 (the period before and after Schulhof's statements), drawing all inferences in favor of plaintiffs, we conclude that material factual issues remain as to whether or not Schulhof's reported denial of merger talks was misleading.

### C. The Reuters Release

While defendants attempt to exclude the *Forbes* article and accompanying notes under the trustworthiness element of Rule 803(24), they attempt to exclude the Reuters release under another element of the same rule—the probativity element, which requires that the proffered statement be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." Fed. R.Evid. 803(24)(B). Defendants argue that

5. In this regard, the authority on which defendants rely, *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238 (3d Cir.1983), *rev'd on other grounds*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), cuts against them. In that case, the district court had excluded as untrustworthy certain employees' "unintelligible" diaries, determining that the diaries were lacking in trustworthiness. The Third Circuit reversed on the ground that documents "which might otherwise be irrelevant because of unintelligibility may become clearly relevant because in whole or in part their meaning becomes intelligible" in light of other evidence. *Id.* at 290. In the same way, Gubernick's testimony and her article together make intelligible her otherwise unintelligible notes. We note as well that the Third Circuit concluded, in the context of the business records exception, that "unintelligibility is a factor extraneous to the trustworthiness inquiry. Ambiguities in a business record, as with any evidence, may be argued to the jury." *Id.* at 291.

the June 21, 1989 Reuters news release (which quoted Schulhof as saying that "there's nothing on the table" between Sony and an American movie studio) fails under this element because plaintiffs chose not to subpoena the reporter who wrote the article, Samuel Perry. Relying on *Larez*, 946 F.2d at 644, defendants argue that a news article may not be admitted under 803(24)(B) when better evidence of the matter reported is available in the form of testimony by the reporter who wrote the article.

Plaintiffs respond that Perry's testimony is unnecessary since they have produced alternate, and comparably probative, evidence of Schulhof's statements—Sony internal memoranda, written by Sony public relations personnel who were present at the press conference at which Schulhof made his statements, confirming the accuracy of the Reuters release. These memoranda, they argue, constitute corporate admissions and establish the trustworthiness of the Reuters release. We agree.

The two memoranda were both authored or co-authored by Stephen Burke, a Sony Corporation of America ("Sonam") public relations manager. Sonam was a wholly owned subsidiary of Sony USA that, among other things, handled Sony USA's public relations activities. Burke was the organizer of the June 21 Sony press conference, on new Sony optical technology, at which Schulhof was the keynote speaker. Burke testified in his deposition that he invited Perry to attend and that he was present throughout; that Schulhof agreed to answer some questions from Perry following the conference; that Burke introduced Perry to Schulhof as Schulhof was leaving; and that Perry and Schulhof spoke briefly before Schulhof left. The day after the Reuters release was published, Burke wrote a memorandum, which he circulated to Sony senior executives in Tokyo, confirming that "[t]he Reuters report accurately reflects Mr. Schulhof's input." (Pls.' App. 882.) [6]

Defendants respond that Burke's memorandum is not a party admission because Burke was not an employee of either Sony Japan or Sony USA, the corporate defendants, and "had no responsibilities in connection with [defendants'] activities in relation to the motion picture industry." (Defs.' Reply Mem. at 22.) Burke's responsibilities, they argue, related to the electronics trade press, not to the press covering financial news. Accordingly, they argue, Burke had no authority, express or implied, to bind defendants to an admission about the entertainment business, and in any case is no substitute for Perry's testimony.

We find defendants' arguments meritless. First, we conclude that, under Rule 801(d)(2), Burke's testimony and contemporaneous memorandum constitute admissions by a party opponent. *See, e.g., Nestle Co. v. Chester's Market, Inc.*, 571 F.Supp. 763, 775 n. 9 (D.Conn.1983), *rev'd on other grounds*, 756 F.2d 280 (2d Cir.1985) (documents produced from Nestle's files, consisting of internal memoranda and correspondence, are admissible as party admissions). We find no merit in defendants' argument that, as a Sonam public relations manager specializing in the electronics trade press, Burke could not speak for Sony on the issue of Schulhof's comments regarding Columbia. In writing the June 22 and 23 memoranda, Burke was merely summarizing events at a press conference which he himself had organized. Additionally, the fact that defendants knew of the statements reported in the Reuters release but took no action to deny or correct them, may constitute an adoptive admission under Fed.R.Evid. 801(d)(2)(B).

Second, we reject defendants' contention that the Reuters release fails to meet the requirements of subsection B of Rule 803(24). We will not, as defendants urge, generalize the result of *Larez* into a rule declaring that a reporter's in-court testimony is always a necessary foundation for the admission of news reports, even when alternative corroborative evidence is available. In *Larez*, testi-

---

6. The memorandum, dated June 22, 1989 and captioned "Mr. Schulhof's Comments to Reuters," states in part: "The journalist asked if it was true that Sony 'had an offer on the table' for a studio. Mr. Schulhof replied that there was nothing on the table. When asked if he would be involved in any such discussions if they were to occur, Mr. Schulhof replied that he would be involved in such discussions." Pls.' App. 882.

mony by the reporters would have been clearly more probative evidence than the newspaper articles proffered, as the reporters could be cross-examined while the newspaper articles, of course, could not. Here, on the other hand, more than one source of probative evidence is available to lay the necessary foundation for the Reuters release. Burke is available for cross-examination at trial. He was physically present at the conversation between Perry and Schulhof, and he prepared a contemporaneous memorandum that confirmed the article's accuracy, and has testified to the memorandum's accuracy. Additionally, although we do not pass on the validity of this claim at this point, plaintiffs argue that, under the Second Circuit's test for compelling disclosure from journalists, *In re Petroleum Products Antitrust Litigation*, 680 F.2d 5, 7 (2d Cir.), *cert. denied*, 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982), Perry's testimony was not readily available. Thus, we conclude that the Reuters release and Burke's June 22 memorandum are admissible.

Having found these admissible, we conclude that defendants have not demonstrated a lack of factual questions regarding the misleading nature of the Reuters release. We reach the same conclusion with regard to the April 1989 statement of M. Morita claiming that Sony had broken off negotiations to acquire a motion picture studio. As summarized above, when all ambiguities are resolved and all reasonable inferences are drawn in favor of plaintiffs, plaintiffs have demonstrated that genuine issues remain about the status of merger activities at Sony in April 1989.

## II. *SCIENTER*

■ Defendants argue, secondly, that even if questions remain about whether they made misstatements, their conduct was, at worst, negligent and did not rise to the level of intentional or reckless misconduct that comprises the scienter element of § 10(b) liability. Plaintiffs have produced no evidence, they argue, from which a factfinder could reasonably infer that Schulhof was motivated to lie in order to deceive the public. We disagree.

The Second Circuit has long held that reckless behavior may satisfy the scienter requirement in 10(b) actions. *Breard v. Sachnoff & Weaver, Ltd.*, 941 F.2d 142, 144 (2d Cir.1991); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 44–47 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). As we have stated previously, the conduct governed by the term "recklessness" is not easy to define, given the varying standards that have been applied within this circuit. *DuPont v. Brady*, 646 F.Supp. 1067, 1073 (S.D.N.Y.1986), *rev'd on other grounds*, 828 F.2d 75 (2d Cir.1987). For purposes of this case, we find relevant the statement of Judge Friendly in the seminal case of *SEC v. Texas Gulf Sulphur Co.*:

> [W]e hold that Rule 10b–5 is violated whenever assertions are made ... in a manner reasonably calculated to influence the investing public, *e.g.*, by means of the financial media, if such assertions are false or misleading or are so incomplete as to mislead irrespective of whether the issuance of the release was motivated by corporate officials for ulterior purposes.

401 F.2d 833, 862 (2d Cir.1968) (Friendly, J., concurring), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

■ However, we need not be detained excessively by a search for the exact standard, given the posture of this case. Resolution of the question of scienter, as with any issue of motive or intent, generally requires examination of a witness's demeanor and credibility and is thus usually inappropriate for disposition on summary judgment. *Litton Indus. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 751 (2d Cir.1992); *Wechsler v. Steinberg*, 733 F.2d 1054, 1058 (2d Cir.1984). We may not grant summary judgment to defendants in a § 10(b) action on the ground of lack of scienter unless the plaintiffs have failed to present facts that are capable of supporting an inference of bad faith or an inference that defendants acted with intent to deceive. *Wechsler*, 733 F.2d at 1059. Such proof need not be direct but may be a matter of inference from circumstantial evidence. *Id.* at 1058.

Here, plaintiffs have produced evidence capable of supporting such an inference. For

example: 1) evidence that the market price of Columbia common stock was rising in response to information that Columbia might be acquired (Pls.' Ex. 38, at U–1957); 2) evidence that defendants were aware of this and concerned about the trend and its impact on the cost of the acquisition of Columbia (Pls.' App. 430–31); 3) evidence that Schulhof's statements to *Forbes* and Reuters were made at a time when he was actively involved in consultation and negotiation over a possible acquisition of Columbia (Pls.' Mem. at 90–92), thus casting doubt on the inadvertence of his denials; and 4) evidence that Schulhof and Morita were not novices at dealing with the press but were experienced corporate spokesmen actively involved in the very activity they were denying (Pls.' Mem. at 96). We conclude that these facts, among others presented by plaintiffs, are sufficient to support an inference that defendants acted with bad faith or intent to deceive. Accordingly, defendants have failed to carry their burden of demonstrating a lack of issues of material fact on the scienter element.

### III. *WHETHER DEFENDANTS HAVE REBUTTED PLAINTIFFS' PRESUMPTION OF RELIANCE*

■ Defendants argue as well that plaintiffs have failed to satisfy the element of reliance. Plaintiffs do not claim that they sold their Columbia stock in actual reliance on the statements in the Press Reports denying that Sony and Columbia were in negotiations. Instead, plaintiffs invoke the "fraud on the market" theory, pursuant to which a person who trades on an open securities market after the issuance of a materially misleading statement may invoke a rebuttable presumption that, in trading, he or she relied on the integrity of the price set by the market. Plaintiffs argue, in other words, that they sold their Columbia stock at prices which had been artificially depressed by the Press Reports. Defendants respond that they have rebutted plaintiffs' presumption of reliance by demonstrating that Sony's statements in those reports had no significant effect on the price of Columbia stock.

The controlling case on the presumption of reliance in 10b–5 actions is *Basic Inc. v.*

*Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). In *Basic,* the Court accepted the hypothesis "that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Id.* at 246, 108 S.Ct. at 991. Because "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price, [and] [b]ecause most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action." *Id.* at 247, 108 S.Ct. at 992. This presumption, however, may be rebutted: "*Any showing that severs the link between the alleged misrepresentation and ... the price* received (or paid) by the plaintiff ... will be sufficient to rebut the presumption of reliance." *Id.* at 248–49, 108 S.Ct. at 992 (emphasis added).

Defendants argue that they have "severed the link" between the Press Reports and the price of Columbia stock by demonstrating that the Press Reports "did not alter the market's perception of Columbia as an attractive acquisition candidate." In support of this proposition, defendants present an affidavit by Daniel Fischel, a noted expert in the application of economic theory to corporate law. Fischel's affidavit examines newspaper and magazine articles, analyst reports, and public filings from the period during and immediately preceding the Class Period—"the universe of public information available to the market" on the subject of Columbia and its attractiveness as a possible acquisition candidate during that period. In addition, the affidavit includes a "comparable index study," comparing the trajectory of Columbia stock with that of other firms in the motion picture industry and with the stock market as a whole; the study is intended to demonstrate that the Press Reports did not "bias the market" but rather that the market's "acquisition expectations" remained "built into Columbia's stock price."

Defendants summarize Fischel's conclusions as follows:

1. In the months preceding the Class Period, Columbia was widely reported to

be an acquisition candidate attractive to Sony and other potential bidders. Consistent with these reports, Columbia's stock price rose relative to the overall market and other firms in the motion picture industry between January 18, 1988 (when trading in Columbia began) and March 23, 1989 (the last trading day before the start of the Class Period).

2. There is no evidence that the *Forbes* Article and the April *Reuters* Release altered the financial community's assessment of the likelihood that Columbia would be acquired by Sony or anyone else. The *Forbes* Article and the April *Reuters* Release had no statistically significant effect on Columbia's stock or option prices.

3. Similarly, there is no evidence that the June *Reuters* Release or the *Times* Excerpt had any effect on expectations about the likelihood that Columbia would be acquired. These June Press Reports had no statistically significant effect on Columbia's stock or option prices.

4. Throughout the Class Period, articles and analyst reports continued to describe Columbia as an attractive acquisition candidate. Analysis of Columbia's stock price performance shows that the acquisition expectations, which were built into Columbia's stock price before the Class Period, did not dissipate during the Class Period but instead, remained built into Columbia's stock price.

Defs.' Mem. at 72–73.

Plaintiffs do not challenge Fischel's statistical analysis. Instead, they respond with an affidavit by their own securities expert (the "Matthews Affidavit") which pursues a different inquiry. Rather than address, as Fischel does, whether the Press Reports had an effect on the price of Columbia stock, plaintiffs address whether *full disclosure* by defendants during the Class Period would have affected Columbia stock. Defendants, they argue, have misconstrued what showing is required to rebut the presumption of reliance; the appropriate test is not whether the misrepresentations had any effect on the market price of Columbia stock; instead, it is "whether the accurate disclosure of the misstated facts would have changed the market's

assessment, *i.e.*, would the market have reacted if Sony defendants had truthfully disclosed, among other facts, that Sony was engaged in merger negotiations with Columbia." (Pls.' Mem. at 98) That is, plaintiffs contend that the appropriate benchmark against which the impact of an alleged misrepresentation must be measured is not, as defendants contend, "no comment," but rather full disclosure.

This is a distinction which at trial of this case could well prove decisive, and one which the authorities cited by the parties do little to clarify. In order to reach their conclusion, plaintiffs rely on *Basic* and on the few cases in which the courts have applied *Basic*'s language on rebuttal of the presumption. Plaintiffs purport to find their proposed standard—that a misrepresentation must be measured against full disclosure—in the *Basic* Court's elaboration of ways in which defendants may "sever the link" between misstatement and the price of a firm's stock. The Court listed two methods of "severing the link" that are relevant to this case:

> For example, if [defendants] could show that the "market makers" [in the target's stock] were privy to the truth about the merger discussions here with [the suitor], and thus that the market price would not have been affected by their misrepresentations, the causal connection could be broken: the basis for finding that the fraud had been transmitted through market price would be gone. Similarly, if, despite [defendants'] allegedly fraudulent attempt to manipulate market price, news of the merger discussions credibly entered the market and dissipated the effects of the misstatements, those who traded [the target's] shares after the corrective statements would have no direct or indirect connection with the fraud.

485 U.S. at 248–49, 108 S.Ct. at 992.

Defendants note that in the few cases in which the courts have construed the *Basic* rebuttal standard (all from the Ninth Circuit), the courts have made the same factual inquiry, based on the second method of "severing the link" listed above: Did the defendants prove that despite their alleged omission or misrepresentation, the omitted or

misrepresented information was "made credibly available to the market by other sources," with "a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations"? *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115, 1116 (9th Cir.1989); *In re Convergent Technologies Sec. Litig.*, 948 F.2d 507, 513 (9th Cir.1991); *In re Seagate Technology II Sec. Litig.*, 802 F.Supp. 271, 275 (N.D.Cal.1992).

 Plaintiffs appear to assume—erroneously, in our view—that requiring proof that "news of the merger discussions credibly entered the market" is equivalent to requiring proof that *full disclosure by corporate officials* would have had no effect on the price.[7] We cannot agree with plaintiffs' position. As plaintiffs' own expert acknowledges (Matthews Aff. ¶ 26), disclosures by senior corporate officials regarding possible corporate acquisitions carry significantly more weight with the investing public than do "generalized market rumors" or other information not confirmed by corporate spokespersons. Additionally, we cannot agree with plaintiffs that the *Basic* Court *required* defendants seeking to "sever the link" to show that "news of the merger discussions entered the market and dissipated the effects of the misstatements." This was merely one of three examples given by the Court of how the link might be severed; these examples were not intended to spell out the full range of rebuttal evidence that may be utilized by plaintiffs in such cases. *See* 485 U.S. at 248–49, 108 S.Ct. at 992.

We do not need to base our decision on this distinction, however, for we conclude that defendants' "truth on the market" defense fails whether we measure the Press Reports, as plaintiffs urge, against full disclosure or, as defendants urge, against corporate silence. Under either standard, we would find defendants' burden of rebutting the presumption of reliance extremely difficult, perhaps impossible, to meet at the summary judgment stage.[8] Even under the standard proposed by defendants—that defendants need merely show that the Press Reports had no significant impact on the price of Columbia stock—defendants' task of demonstrating the statements' lack of impact on Columbia's stock is not as easy as defendants represent.

 Defendants purport to show that the Press Reports had "no significant impact" by pointing to the lack of evidence that they "altered the financial community's assessment of the likelihood that Columbia would be acquired." (Defs.' Mem. at 72–73.) This misconstrues the standard set out in *Basic*. Plaintiffs do not bear the burden, as they do with regard to the other elements of a 10b–5 action, of producing evidence sufficient to show that defendants' misstatements altered the market price of Columbia stock. Rather,

---

7. Plaintiffs find justification for this standard in the uncontroversial proposition that, even when corporate representatives have no duty to disclose information regarding a particular matter, when such an individual chooses to speak, his or her statements must be "truthful and complete, and not materially misrepresent the facts existing at the time of the announcement." *Robbins v. Moore Medical Corp.*, 788 F.Supp. 179, 184 (S.D.N.Y.1992); *accord Ackerman v. Schwartz*, 947 F.2d 841, 848 (7th Cir.1991); *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1317 (5th Cir.1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978); *In re Columbia Sec. Litig.*, 747 F.Supp. 237, 245 (S.D.N.Y.1990). While we do not, of course, disagree that the duty described above exists, we do not find it relevant to an examination of the *Basic* rebuttal standard.

8. Summary judgment has been upheld based on a "truth on the market defense" in a few cases.

*See In re Apple*, 886 F.2d at 1114–15; *In re Convergent*, 948 F.2d 507, 513 (9th Cir.1991). Those cases, however, concerned a different type of misleading statement—misleading predictions of product performance, as opposed to denials of merger negotiations. The Ninth Circuit in those cases concluded that any presumption that the market had relied on defendants' overly optimistic evaluations had been rebutted by evidence that more sobering information about the products had "credibly entered the market" and dispelled the effect of defendants' statements. Clearly, a company's predictions or claims about the upcoming success of its products constitute a different type of misleading statement than a company's misleading denial of merger negotiations—one less likely to be material, as investors realize it to be a statement of opinion rather than fact, and thus one whose significance for investors is more likely to be offset by competing published reports.

once plaintiffs have shown that materially misleading statements have been disseminated into a well-developed securities market, the burden shifts to defendants to "sever the link" between the misstatements and market price—that is, to demonstrate that the statements had no effect on that market. *See Basic*, 485 U.S. at 246–49, 108 S.Ct. at 991–92. As Justice White noted in his dissent in *Basic*, this is a staggering burden. 485 U.S. at 256 n. 7, 108 S.Ct. at 996 n. 7 ("rebuttal is virtually impossible in all but the most extraordinary case"). In order to demonstrate absence of impact, defendants, essentially, must prove a negative. Whether this can ever be proved on summary judgment purely through the kind of economic analysis that defendants provide is an open question.[9]

This is not a question, however, which we need to consider at this time, as it is clear that genuine issues of fact remain and preclude summary judgment on this element. While defendants have presented evidence that Columbia's stock did not *drop* as a result of the Press Reports (Fischel aff. ¶¶ 30–39), they have not foreclosed questions about what kind of *rise* in price the Reports might have forestalled (see Matthews Aff. ¶¶ 9–11). To use defendant's phrase, they have not demonstrated the degree of maturity of the "acquisition expectations" that were built into the price of Columbia's stock. The fact that Columbia stock jumped 25 percent when Columbia finally announced in September 1989 that it was engaged in acquisition discussions with an unannounced suitor is convincing evidence that whatever "acquisition expectations" were previously built into Columbia stock before this date were less than fully confident ones.

We conclude, accordingly, that genuine issues of fact regarding the market impact of the Press Reports preclude summary judgment on the reliance element. We of course express no opinion on the weight a jury might accord to defendants' "truth on the market" defense. Defendants may present their evidence supporting this theory at trial; we merely conclude here that resolving such a fact-intensive inquiry is not appropriate at the summary judgment stage.

## IV. MATERIALITY

 Defendants argue finally that if they made any misleading statements regarding the state of their negotiations with Columbia, those statements were not materially misleading.

 The test of the materiality of alleged misstatements, as we have previously stated in this case, 747 F.Supp. at 243, is the fact-specific inquiry set out in *Basic*—whether, balancing the significance of a potential merger against the probability that it would not be consummated, there is a substantial likelihood that a reasonable investor would have viewed the existence of merger discussions as significantly altering the "total mix" of information available. *Basic*, 485 U.S. at 231–32, 238, 108 S.Ct. at 983, 986. The *Basic* Court instructed that, in order to assess the probability that an event will occur, we are to look to "indicia of interest in the transaction at the highest corporate levels," including but not limited to such indicators as board resolutions, instructions to investment bankers, and negotiations between principals or their intermediaries. *Id.* at 239, 108 S.Ct. at 987. Since a merger in which a company is bought out is "the most important event that can occur in a small corporation's life, to wit, its death," information regarding a merger can become material at an earlier stage than information concerning lesser transactions. *Id.* at 238, 108 S.Ct. at 986. Additionally, the mere possibility of a merger may have significance for investors; whether or not a merg-

---

9. Defendants appear to suggest in Fischel's affidavit that the separate inquiries into materiality and reliance should be collapsed into one inquiry—an inquiry into whether defendants' misstatements or omissions affected the market price of the securities in question. Fischel aff. ¶¶ 24–26; *and see* Daniel R. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases involving Actively Traded Securities*, 38 Bus. Lawyer 1, 10–13 (1982) (arguing that separate inquiries into cau-

sation, reliance, materiality, and damages should be collapsed into single inquiry into market impact). Such an approach could have the effect of shifting the burden of proof to plaintiffs to demonstrate the market impact of defendants' misstatements. Whatever its merits, however, the suggestion does not accurately reflect the standards on materiality and the presumption of reliance that the Supreme Court set out in *Basic*, which we are constrained to follow.

484

er eventually takes place. *Id.* at 239 n. 16, 108 S.Ct. at 987 n. 16.

In *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976), the case from which the *Basic* Court borrowed its materiality test, the Court characterized the issue of materiality as a mixed question of law and fact not usually resolvable on a motion for summary judgment:

> The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment.

*Id.; and see Mendell v. Greenberg*, 927 F.2d 667, 673 (2d Cir.1990), *modified on other grounds*, 938 F.2d 1528 (2d Cir.1991).

Defendants argue (Defs.' Mem. at 83 ff.) that the statements in the *Forbes* Article and the Reuters Release "were accurate or, to the extent inaccurate in any way, were not materially so." We cannot agree. We conclude that numerous issues of fact remain regarding the materiality of defendants' statements. As the Second Circuit has noted, where the magnitude of the prospective event is so great, as it is here, the balance will tip in favor of a finding of materiality even if the probability of the merger occurring "cuts much less sharply in favor of plaintiff." *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 736 (2d Cir.1987), *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988). In this case, the record is full of indicia of interest in the merger at the highest corporate levels, beginning before the Class Period and continuing throughout (including at the time of both Press Reports and of M. Morita's April statement to Reuters). These indicia of interest include: (i) decisions to pursue negotiations by Kaufman, Keough, and Allen, the Executive Committee of the Columbia Board of Directors; (ii) formal resolutions, meetings, and other involvement by Sony President Ohga, Chairman A. Morita, and the other members of the Sony Executive Committee; (iii) negotiations over price between Schulhof, acting for the Sony corporate defendants, and Allen, who (together with Allen Inc.) was retained and utilized by Columbia and Coca-Cola to handle the negotiations for the sale of Columbia: (iv) the provision of a continuous stream of non-public business information on Columbia to defendants and Blackstone by Allen Inc., including financial forecasts, budgets, and asset valuations; (v) substantial and direct participation of financial and legal advisors in preparing for and facilitating the merger; (vi) interviews and offers to hire managers for Columbia under Sony ownership; (vii) communications with lending institutions to secure financing for the deal; and (viii) the preparation of the complex, multi-party merger and option agreements, SEC filings and offering documents.

We conclude that a reasonable juror considering these numerous indicia of high-level interest could conclude that they significantly altered the "total mix" of information available. Thus, summary judgment on the materiality element is precluded.

CONCLUSION

Defendants thus fail to carry their burden of demonstrating an absence of genuine issues of material fact with regard to any element of plaintiffs' case. Accordingly, defendants' motion for summary judgment is denied.

SO ORDERED.