113 F.3d 1240
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Herbert EISENSTADT, Joel Gerber, Frederick Rand and Richard
Wainer, Plaintiffs-Appellants,
v.
Mark ALLEN, Ken Goldman, T.J. Rodgers, Cypress
Semiconductor, Marcel Gani, Thomas North and
Lowell Turriff, Defendants-Appellees.
 No. 95-16255.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 7, 1996.
Decided April 28, 1997.
 
 Before: SNEED, WOOD, JR.,* and SCHROEDER, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Appellee Cypress Semiconductor Corporation's revenues and earnings per share for the fourth quarter of 1991 and its earnings per share for the first quarter of 1992 fell short of internal and external projections. After Cypress reported these results, its stock price dropped. Appellants, a class of investors who purchased Cypress stock between August 1991 and April 1992, filed the instant action contending that Cypress and several of its officers issued materially misleading statements and adopted materially misleading analysts' reports in violation of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5. Appellants point to more than twenty allegedly misleading statements, including allegedly false statements attributed to the Appellees appearing in newspaper articles and analysts' reports; allegedly false statements which the Appellees made during teleconferences with securities analysts; and allegedly fraudulent forecasts appearing in various securities analysts' reports.[1] Initially, the district court certified a class, but dismissed Appellants' Section 20(a) claims because none of the named plaintiffs had standing to assert a claim under Section 20(a). Appellees moved for summary judgment on the remaining Section 10 and 10b-5 claims with respect to all of the statements. While their motion was pending, Appellants sought leave to add several new statements, but the district court denied them leave. Finally, finding that Appellants failed to put forth evidence showing a genuine issue of fact with regard to a particular statement by any of the Appellees, the district court granted summary judgment. We affirm all orders.
 
 I. Standard of Review
 
 3
 We review a district court order granting summary judgment de novo and may affirm on any basis supported by the record. In re World of Wonder Sec. Litig., 35 F.3d 1407, 1412 (9th Cir.1994), cert. denied sub. nom., Miller v. Pezzani, --- U.S. ----, 116 S.Ct. 185 (1995) and Deloitte & Touche v. Miller, 116 S.Ct. 277 (1995). The standard for summary judgment is well established; summary judgment is appropriate if "no genuine issue as to any material fact" exists. Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hanon v. Dataproducts Corp., 976 F.2d 497, 500 (9th Cir.1992). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. Moreover, plaintiffs in a securities fraud action may survive a motion for summary judgment "only by showing a genuine issue of material fact with regard to a particular statement by [the corporation] or its insiders." Hanon, 976 F.2d at 500.
 
 II. Liability for Direct Statements
 A. Direct Statements Reported by the Media
 
 4
 Appellants challenge several statements attributed to Cypress officers that appeared in newspaper articles and analysts' reports. E.g., Statement B (Barron's August 19, 1991 article quoting Cypress's Chief Executive Officer T.J. Rodgers as saying that "revenues will exceed $300 million in 1991"); Statement K (Defense News Nov. 14, 1991 article quoting Rodgers as saying that 1991 revenues will be "approximately $300 million"). The district court properly granted the Appellees summary judgment with respect to these statements, (Statements B, K and T), because the Appellants have offered no admissible evidence tending to prove that a Cypress insider actually made the alleged misrepresentations.
 
 
 5
 Appellants point to the newspaper articles and reports themselves and several pages of unauthenticated handwritten notes as evidence that a Cypress insider made each of the alleged misrepresentations. However, Appellants' arguments to the contrary, the newspaper articles clearly fall within the definition of hearsay contained in Federal Rule of Evidence 801(d), Larez v. City of Los Angeles, 946 F.2d 630, 642 (9th Cir.1991), and, thus, are inadmissible. As such, the district court properly refused to consider them in opposition to a motion for summary judgment. See Blair Foods, Inc. v. Ranchers Cotton Oil, 610 F.2d 665, 667 (9th Cir.1980).
 
 
 6
 Appellants argue that even if these articles are hearsay, they are admissible under the residual exception contained in Federal Rule 803(24). Under Rule 803(24), otherwise inadmissible hearsay may be admitted if the statement has "circumstantial guarantees of trustworthiness," is probative of a material fact and is the most probative evidence the proponent can secure using reasonable efforts and if admitting the statement will serve the ends of justice. Fed.R.Evid. 803(24); Larez, 946 F.2d at 642. Appellants' evidence fails to meet two of these requirements.
 
 
 7
 First, the articles lack circumstantial guarantees of trustworthiness. To establish circumstantial guarantees of trustworthiness, proponents must demonstrate that the hearsay declarant's perception, memory, narration or sincerity are reliable. May v. Cooperman, 780 F.2d 240, 263 (3d Cir.1985) (Becker, J., dissenting on other grounds); see United States v. Friedman, 593 F.2d 109, 119 (9th Cir.1979). Unsupported newspaper articles usually provide no evidence of the reporter's perception, memory or sincerity and, therefore, lack circumstantial guarantees of trustworthiness. Larez, 946 F.2d at 643. In Larez, we recognized an exception to this rule where the "extraordinary circumstances" surrounding the proffered articles provide sufficient guarantees of trustworthiness. Id. However, in Larez articles from three independent newspapers attributed the same statement to the defendant and the defendant was a "known declarant" who had testified at trial. Id. Also, the defendant did not deny making the statements. Id. at 644.
 
 
 8
 Here, the Appellants offer several articles containing similar statements. However, the statements did not arise from the same interview nor are they as close in content as the three statements in Larez. Additionally, the Appellees testified that they did not recall making the disputed statements. (See e.g., SR 350: Rodgers Dep. at 670-72.) To counter these difficulties, Appellants offer several pages of unauthenticated handwritten notes. However, without the author's testimony, these ambiguous notes do not corroborate the statements in the articles. Cf. In re Colombia Sec. Litig., 155 F.R.D. 466, 477 (S.D.N.Y.1994) (the reporter's testimony, a newspaper article and the reporter's notes together possessed circumstantial guarantees of trustworthiness).
 
 
 9
 Likewise, we cannot say that the proffered newspaper articles and reports are the best evidence available. A newspaper article alone, generally, will not be the best evidence available. Rather, as we recognized in Larez, a reporter's testimony, most likely, will be the best evidence available because it, unlike a newspaper article, is subject to cross-examination. Larez, 946 F.2d at 644. Appellants correctly note that the Colombia Securities court admitted proffered newspaper articles without the reporter's testimony. 155 F.R.D. at 478-79. However, in Colombia Securities the proponents offered testimony from a third party who was present at the interview during which the defendant allegedly made the contested statements. Colombia Sec., 155 F.R.D. at 479. That third-party's testimony, like the reporter's testimony in Larez, would have been subject to cross-examination. Id. Additionally, the third party prepared a contemporaneous memorandum of the interview and testified as to the memorandum's accuracy. Id. Therefore, the court reasoned that the reporter's testimony was not necessary to fulfill the best evidence requirement. Id.
 
 
 10
 Here, on the other hand, Appellants have offered no form of evidence that would be subject to cross-examination at an eventual trial and have not demonstrated that they could not obtain such evidence using reasonable efforts. Appellants maintain that they were unable to depose the journalists because the district court limited each side to twenty depositions. However, Appellants' tactical decision to commit their discovery resources to other avenues does not demonstrate that they could not obtain the testimony using reasonable efforts. Cf. Colombia Sec., 155 F.R.D. at 479 (plaintiffs argued that the reporters' testimony was unavailable because the reporters could not be compelled to testify under the Second Circuit's test for compelling journalists' testimony). Furthermore, although Appellants had no remaining depositions by the time they learned that the Appellees would not admit to making the challenged statements, Appellants could have submitted affidavits from the reporters testifying to the source of the statements and authenticating their notes. Appellants offer no evidence that they could not obtain affidavits using reasonable efforts. Therefore, the district court properly ruled that the proffered articles were inadmissible hearsay. See Cooperman, 780 F.2d at 263 (Becker J., dissenting on other grounds) (newspaper articles inadmissible to show legislative intent where the plaintiffs made no showing of inability to locate observers who attended the legislative debates about the challenged statute).
 
 B. Optimistic Forecasts
 
 11
 Evidentiary problems aside, Appellants have failed to raise a triable issue as to whether any of the challenged statements are actionable. In addition to the statements in the newspaper articles and reports, Appellants challenge several optimistic predictions and forecasts about Cypress's fourth and first quarter earnings and revenues that Cypress insiders made during teleconferences with market analysts and in press releases. For example, Appellants challenge Rodgers's statement in the August 19, 1991 edition of Barron's that Cypress expects $300 million in revenues for 1991 and that Cypress is "bullish" on its outlook for 1992 and "comfortable" with analysts' predictions for Cypress's 1991 and 1992 earnings. (Statement B). Appellants also challenge Rodgers's October 14, 1991 statement to market analysts that Cypress expected a "record for revenue" in the fourth quarter of 1991, (Statement F), and Rodgers's comments appearing in the November 4, 1991 edition of Defense News stating that Cypress's 1991 revenues would be approximately $300 million and that he was "bullish" about 1992. (Statement K). Finally, Appellants contend that a statement that "the company" expects "some improvement" in the first quarter of 1992 appearing in the January 21, 1992 edition of the Wall Street Journal is also misleading. (Statement U).
 
 
 12
 As we have stated before, a forecast or statement of optimism is actionable as a fraudulent misrepresentation only if (1) the defendants did not believe the forecast at the time they issued it; (2) the defendants had no reasonable basis to rely on the forecast; or (3) the defendants failed to disclose material adverse facts which tended to "seriously undermine the accuracy of the statement." In re Apple Computer Sec. Litig., 886 F.2d 1109, 1113 (9th Cir.1989). Here, Appellants do not contend that Cypress did not believe these statements when the insiders made them. In fact, Appellants concede that all of the optimistic statements coincided with Cypress's internal forecasts for these quarters. (See, e.g., Pl. Statement Resp. to Defs.' Statement of Undisputed Material Facts at 5-7). Instead, Appellants contend that Appellees lacked a reasonable basis to rely on their internal forecasts and earning predictions and that Appellees were aware of undisclosed adverse facts which would have undermined the accuracy of Cypress's internal forecasts.
 
 1. Reasonable Basis
 
 13
 The record establishes that Cypress's internal forecasts, known as the beginning-of-quarter forecast ("BOQ") and the end-of-quarter forecast ("EOQ"), had accurately predicted Cypress's earnings and revenues for the fourteen quarters prior to the start of the class period. Such historical accuracy gave Cypress a reasonable basis to rely on its fourth and first quarter predictions. See In re Convergent Tech. Sec. Litig., 948 F.2d 507, 517 (9th Cir.1991) (a company's history of success reasonably supports an optimistic forecast); see also, Kowal v. M.C.I. Communications Corp., 16 F.3d 1271, 1279 (D.C.Cir.1994) (same).
 
 
 14
 Appellants contend that despite the forecasting processes' past successes, Cypress could no longer reasonably rely on its forecasts because "the defendants had begun to doubt Cypress' [sic] ability to generate accurate forecasts." (Pl.Br. at 10). To demonstrate Appellees' reservations about Cypress's internal forecasts, Appellants point to several internal memoranda describing the BOQ process as "broken" and "failing." (Id. at 10-11). These include an October 25, 1991 status report prepared by Cypress's Chief Financial Officer Kenneth Goldman and enclosed in the Board of Directors' package for its October 31, 1991 meeting, (ER 280:18-20); a November 16, 1991 memo from Cypress Treasurer Marcel Gani to Goldman, (ER 318:344-46); a December 12, 1991 status report prepared by Goldman and enclosed in the Board of Directors' package for its December 19, 1991 meeting, (ER 280:21-25); and a December 30, 1991 memo from Goldman to several Cypress officers and distributed to Rodgers, (ER 318:51-54). The earliest of these documents originated on October 25, 1991 and was not distributed until October 31, 1991. However, Rodgers purportedly made two of the challenged statements before then. Therefore, these memoranda cannot establish that Rodgers lacked a reasonable basis to rely on Cypress's internal forecasts when he made the challenged statements.
 
 
 15
 Moreover, as the district court noted, when read in its entirety, each of these documents criticizes the time it took Cypress to complete the BOQ rather than the accuracy of the BOQ. For example, Appellants contend that "Defendant Goldman privately stated in October 1991 that Cypress' 'BOQ' process--by which Cypress generated a forecast at the beginning of each quarter--has been 'poorly managed' and was 'failing '." (Pl.Br. at 10). However, the portions of the memorandum from which Appellants quote the above language read in their entirety, "5.4Q BOQ process poorly managed; revenue finalized October 23" and "3.BOQ forecast system failing--new rules required." (ER 280:20). Similarly, Appellants cite to a memorandum from Goldman to several Cypress officers and distributed to Rodgers describing the BOQ process as "a limping system." (Pl.Br. at 11). However, the memorandum actually describes the BOQ process as "a 'limping' system," suggesting that Goldman himself did not characterize the system as limping. (ER 318:51). Rather, he was repeating someone else's characterization. The memorandum does not identify who this third party is, nor does it explain whether Goldman agreed with the characterization. Furthermore, the memorandum proposes instituting several actions to improve the BOQ process, including "creat[ing] simple BOQ flow charting, highlighting key dates and milestones and "put[ting] on corporate calendar manufacturing BOQ production meeting." (Id.) These actions and others proposed in the memorandum relate to improving the time it took Cypress to complete the BOQ, rather than improving the accuracy of the BOQ.
 
 
 16
 Appellants contend that the court is not permitted to read these documents in their entirety on summary judgment because determining the context of a statement is akin to ruling on a witness's credibility, (Pl.Br. at 6), or interpreting a document. Appellants reason that both of these determinations fall clearly within the realm of the jury. Appellants are correct that the district court may not interpret a document on a motion for summary judgment. However, the district court, likewise, is not prohibited from reviewing an entire document, nor is it restricted to reviewing the snippets which the non-moving party puts forth. Furthermore, the district court is not bound to accept the non-moving party's characterization of the document. Rather, the district court is entitled to view the entire document put forth in opposition to summary judgment and need only draw all reasonable inferences in favor of the non-moving party. See Hanon v. Dataproducts Corp., 976 F.2d 497, 507 (9th Cir.1992) (in reviewing summary judgment, the court is entitled to consider the plausibility and reasonableness of inferences arising from circumstantial evidence). As demonstrated above, when read in their entirety, these documents do not support a reasonable inference that the Appellees believed that the BOQ and EOQ were unreliable. Therefore, the district court properly concluded that Appellants had not put forth any evidence demonstrating that the Appellees lacked a reasonable basis for their optimistic predictions and forecasts.
 
 
 17
 Moreover, the only document which arguably supports an inference that the author did not believe that the BOQ process was reliable is the November 16 memorandum from Gani to Goldman. The memorandum states that "The BOQ process at Cypress is broken and needs to be fixed," and it lists the unreliability of Ross data and informing controllers and vice presidents that their "performance review will be heavily weighted by their accuracy on forecast" as "BOQ Issues." (ER 280:344-45). However, that memo also states that "The purpose of this memo is to propose some ideas to improve the flow of the BOQ process at Cypress.... In the last few quarters, we have put some fixes in place,...." (Id. at 344). The memorandum goes on to list other issues and suggest improvements, including addressing the timeliness of the sales and package plan; addressing the timeliness of the manufacturing plan; and listing BOQ review dates as distinct dates on the corporate calendar. (Id. at 344-45). Additionally, the memorandum concludes with a proposed timetable for completing various aspects of the BOQ process. (Id. at 346). Reading this memorandum in its entirety reveals Gani believed that the timing of the BOQ process rather than the accuracy of the forecasts was "broken and need[ed] to be fixed." Furthermore, the memo lists Goldman as its only recipient, and Appellants have offered no evidence that Rodgers ever received a copy of the memorandum or read it. As such, Appellants have offered no evidence to suggest that Rodgers knew that anyone at Cypress questioned the reliability of the BOQ process. Unfortunately for Appellants, Rodgers purportedly made three out of the four statements that Appellants challenge. The fourth--the Wall Street Journal statement--is attributed only to the "company," and Appellants have offered no other evidence establishing the declarant. Therefore, Appellants cannot rely on the Gani memorandum to create a material issue of fact.
 
 
 18
 Appellants also contend that Rodgers's optimistic statements were unreasonable because internal forecasts other than the BOQ and EOQ predicted "flat" revenues for the fourth quarter and that the fourth quarter would be a "difficult" quarter. (Pl.Br. at 9-10). For example, Appellants cite a passage from Rodgers's book, No Excuses Management, wherein he writes, "[s]oon after [July 1991], we realized that Cypress was in for several lean quarters--that revenue might actually shrink rather than just grow more slowly than before." (SR 319). Likewise, Appellants rely on internal memoranda from Goldman stating that third quarter revenue was below internal and external expectations and that fourth quarter revenue will also be "difficult," (ER 280:19), and that "We have a serious profit shortfall in the third quarter.... Revenue is effectively flat Q2 to Q3." (ER 280:548). However, none of the documents upon which Appellants rely demonstrates that contradictory forecasts existed within Cypress. Rather, the fragments which Appellants present in their brief are yet another example of Appellants' deceptive omission of pertinent parts of documents in an effort to create a triable issue. For example, all Goldman's internal documents stating that Cypress will experience a "flat" quarter discuss third quarter revenue. Therefore, they do not contradict Rodgers's statement that Cypress would achieve record revenues for the fourth quarter, (Statement F), or the company's statement that Cypress would experience some improvement in the first quarter. (Statement U). Goldman's October 25, 1991 status report does state that the "Q4 will also be difficult," but it continues "-base forecast $76.1M revenue and $.21 EPS." (ER 280:19). Therefore, it, likewise, does not contradict Rodgers's purported statement that Cypress would achieve a record for revenue in the fourth quarter.
 
 
 19
 Similarly, Goldman's memoranda do not undermine the validity of Rodgers's prediction that Cypress's 1991 revenue would approximate $300M. (Statements B, F, K). At the times that Rodgers purportedly stated that Cypress revenues would approximate $300M, Cypress's annual plan predicted fourth quarter revenue of $84 million and Cypress's fourth quarter BOQ predicted $76 million in revenue. Therefore, if Cypress's third quarter revenue were flat to Cypress's $75 million second-quarter revenue, Cypress's 1991 revenue would be between $295 million and $303 million. (Cypress achieved $144 million in revenue for the first half of 1991).
 
 
 20
 Appellants also omit pertinent parts of Rodgers's book, No Excuses Management, in arguing that statements in the book show that Cypress's internal forecasts contradicted Rodgers's optimistic public statements. Although Rodgers noted that market conditions would be difficult in the fourth and first quarters in No Excuses Management, he also stated that Cypress was predicting record revenues for the third quarter and that Cypress was projecting third quarter revenue at an annual rate of $301.4 million. (SR 319). These projections also align with Rodgers's purported prediction of $300 million revenue in 1991. Additionally, as the district court noted, none of the forecasts in the book undercut the validity of Cypress's fourth quarter BOQ or EOQ. Therefore, the excerpts from No Excuses Management do not demonstrate that internally Cypress predicted less than record revenues for the fourth quarter. Accordingly, Appellants have presented no evidence that Cypress's internal projections contradicted Appellees' optimistic statements. As such, Appellants have put forth no evidence suggesting that these optimistic statements lacked a reasonable basis.
 
 2. Undisclosed Adverse Facts
 
 21
 Appellants also point to volumes of documents in an effort to demonstrate that while Appellees made these optimistic predictions about Cypress's future it knew that "storm clouds were gathering over Cypress." (Pl.Br. at 21). Appellants contend that Cypress's failure to disclose these adverse facts rendered its optimistic projections materially misleading. However, a corporation "need not detail every corporate event, current or prospective, which has or might have some effect upon the accuracy of an earnings forecast." Marx v. Computer Sciences Corp., 507 F.2d 485, 491 (9th Cir.1974). Rather, a corporation must only disclose those adverse facts which "tend[ ] to seriously undermine the accuracy of the statement." Apple Computer Sec. Litig., 886 F.2d at 1113.
 
 
 22
 In the instant action, Appellees have identified three factors which caused the fourth quarter revenue and earnings shortfalls and one factor which caused the first quarter earnings shortfall which Appellants allege caused their injuries. Appellees claim that problems in the test area, marketing's failure to obtain forecasted orders and product line slips caused Cypress's fourth quarter shortfalls, while price erosion in the market for a Cypress product called SRAM caused Cypress's first quarter shortfalls. (ER 280:268; SR 280: Rodgers Decl. pp 53-59; 65; SR 287/1: 524614-620). Appellants have put forth no contradictory evidence suggesting other causes contributed to the shortfalls. As such, we accept these causes as the reasons why Cypress failed to meet its internal projections. None of the allegedly omitted adverse facts relates to these causes. Therefore, none of these adverse facts tended to seriously undermine the accuracy of Cypress's projections.
 
 
 23
 For example, Appellants allege that Appellees failed to disclose that Cypress's relationship with one of its largest customers, Sun Microsystems, was deteriorating. They point to several documents suggesting such. However, the record indisputably establishes that Cypress either met or exceeded its forecasted sales to Sun during the class period. (SR 286/6: 165748; 287/4: 165923). Therefore, even if Cypress's relationship with Sun was deteriorating during the class period, this deterioration did not affect revenues or profits from sales to Sun and did not contribute to Cypress's financial shortfalls in the quarters in issue. Appellants also maintain that this deteriorating relationship caused Cypress to lose its market for a chip it was developing during the class period, the Pinnacle. However, Cypress did not project any revenues from Pinnacle during the class period. (SR 280: Ross Decl. p 26; 350: Rodgers Dep. at 408). As such, even if the deteriorating relationship had caused Cypress to lose a market for Pinnacle, that loss could not have contributed to Cypress's shortfalls during the class period. Accordingly, any undisclosed adverse facts about Cypress's relationship with Sun could not have seriously undermined the accuracy of Cypress's internal forecasts for the class period. Therefore, although Appellants' evidence may create a genuine issue about Cypress's relationship with Sun, that dispute is not material and does not preclude summary judgment.
 
 
 24
 Appellants also point to documents allegedly detailing delivery, manufacturing and production problems. However, the record demonstrates that these alleged problems did not contribute to Cypress's shortfalls. For example, Appellants point to several documents which they claim establish that Cypress had poor yields on products and that Cypress was unable to improve yields quickly enough to compensate for falling prices. (Pl.Br. at 15). However, Cypress's Director of Manufacturing Mark Allen testified that while poor yields would affect manufacturing costs, actual yields were within one percent of the forecasted yields in the fourth quarter. (SR 350: Allen Dep. at 260). Thus, any problem with Cypress's yields did not cause manufacturing costs to exceed the forecasted costs and, accordingly, did not contribute to revenue or profit shortfalls. Appellants offer no evidence to contradict this testimony.
 
 
 25
 Likewise, Appellants contend that several documents suggest that Cypress was aware of test problems which contributed to the fourth quarter shortfalls. (Pl.Br. at 15-16). While Cypress identified twelve separate test problems which contributed to its fourth quarter miss, (SR 287: 524663-64; SR 280: Allen Decl. pp 40-41; SR 280: Rodgers Decl. p 55), Allen and Rodgers testified that Cypress did not expect these problems. (SR 280: Allen Decl. p 41; SR 280: Rodgers Decl. p 54). Appellants' documents do not contradict this testimony. Appellants point to a November 25, 1991 memorandum from Allen to Rodgers alerting Rodgers that the number of units awaiting test is increasing from 600,000 units to 1 million because of a "bottleneck at burn-in on 64 and 256K's," (ER 318:278), and a draft of an October 29, 1991 memorandum from Steve Alexander to Heber Clement, then test manager, alerting him that inventory of 7C310s, 7C322As and 7C322Bs available for test had increased at various stages of the test process over the past weeks. (ER 318:272-73). However, neither of these problems was one of the twelve problems Cypress identified, and the record establishes neither contributed to the shortfall. For example, Allen testified that Cypress fixed these problems and that they did not affect fourth and first quarter performance. (SR 350: Allen Dep. at 483). The documents themselves also indicate that Cypress corrected these problems shortly after the authors drafted the memoranda. (See, e.g., ER 318:278 (stating that Allen had diverted all the sockets from Cypress's subcontractor to the test division to alleviate the bottleneck); see also SR 350: Allen Dep. at 482-83).
 
 
 26
 Appellants also claim that Cypress failed to disclose its poor record for delivering customer orders on time and that this poor record undermined the accuracy of Cypress's forecasts because it hurt Cypress's relationships with its customers and caused Cypress to lose significant revenue. (Pl.Br. at 16-17). The record establishes that during the quarters at issue, Cypress reported that it delivered products to customers on time more than 90 percent of the time, (SR 285/8:97615), that Cypress's customers reported that they received deliveries on time between 75 and 78 percent of the time, (ER 318:334), and that Cypress's delivery performance was improving. (ER 318:332). However, Appellants cite to several memoranda detailing "lines down" situations at Cypress's customers as proof that Cypress's poor on-time delivery performance caused Cypress to lose significant revenues. Unfortunately for Appellants, none of these memoranda actually show that Cypress lost revenues during the quarters at issue as a result of these alleged delivery problems. For example, Appellants rely on a March 9, 1992 memorandum detailing past delivery problems with a European military customer and stating that if Cypress does not deliver a pending order a $1 million opportunity may be lost. (ER 318:161-62). However, it does not state that Cypress lost the opportunity or the pending sale, and Rodgers's handwritten note at the bottom of the memorandum requests that a Cypress vice president remedy the situation. (Id.) That Cypress vice president responded to Rodgers's request stating th he did remedy the problem. (SR 318:90). Likewise, an August 18, 1991 memorandum to Rodgers states that Cypress "is at risk" of losing its number one vendor status with another customer because of poor delivery performance between January 1, 1991 and June 30, 1991. (ER 318:286-87). However, it does not discuss delivery problems during the quarters at issue, nor does it state that Cypress did lose its number one vendor status or any revenues from sales to this customer at anytime--let alone during the quarters at issue. The other documents upon which Appellants rely suffer from similar failings. (See, e.g., ER 318:316-18; ER 318:301; ER 318:346-52; ER 318:50). Accordingly, any alleged delivery problems did not contribute to the fourth and first quarter shortfalls. Therefore, these problems would not tend to undermine the accuracy of Cypress's forecasts.
 
 
 27
 Finally, Appellants contend that Cypress's use of "pull-ins" undermined the accuracy of their forecasts and that, therefore, Cypress's failure to disclose its reliance on this practice was materially misleading. Appellants contend that pulling in orders in one quarter undermined the integrity of the forecast for the next quarter because Cypress based its forecasts on backlog. (Pl.Br. at 18). However, Appellants put forth no evidence to establish that quarter forecasts incorporated orders which had been pulled into the preceding quarter, and Ross Technologies President Roger Ross testified that Cypress always took pull-ins into account in preparing a forecast. (SR 350: Ross Dep. at 85). Moreover, Appellants put forth no evidence that using pull-ins was inherently fraudulent or deceptive, and the record demonstrates that pulling in orders is a common practice in the semiconductor industry. (SR 350: Lamond Dep. at 43, 44).
 
 
 28
 Appellants also contend that pull-ins undermined the accuracy of Cypress's forecasts because they made future sales more dependent on new customers. (Pl.Br. at 18). However, Appellants put forth no evidence that Cypress failed to make the required sales to new customers, and the record reflects that even though Cypress pulled in orders in the fourth quarter, Cypress started the first quarter with a higher percentage of its forecasted orders booked than it had in three years. (SR 280: Rodgers Decl. p 83(c)). Thus, despite its use of pull-ins in the preceding quarter, Cypress actually required less new sales to meet its first quarter forecast than it had in the past. Therefore, even drawing all reasonable inferences in favor of the Appellants, as we must on summary judgment, the record demonstrates no issue as to whether Appellees failed to disclose any adverse facts which would have undermined the accuracy of their optimistic statements. While the record may reflect some evidentiary disputes about whether certain problems existed at Cypress, the record reflects no dispute over whether these problems contributed to the complained-about shortfalls. Thus, summary judgment is appropriate.
 
 C. Statements about Sun
 
 29
 Appellants challenge several statements that Appellees made regarding Cypress's sales to Sun Microsystems. (Statements E, F, P, R). In general, these statements all concern one of two issues: Cypress's revenues from sales of its SPARC chip to Sun and possible design wins at Sun for Cypress's new Pinnacle chip. The record demonstrates that all of these statements were true when Appellees made them. Therefore, the district court properly granted summary judgment with respect to all of these statements.
 
 
 30
 On September 30, 1991, Sun announced a new product, the "Galaxy" server, which used Cypress's SPARC chip. After this announcement, Rodgers told analysts that Galaxy was a "hit" and that SPARC sales would contribute significantly to gross revenues in the fourth and the first quarters. The record indisputably shows that Cypress's internal projections forecasted increased revenue at Ross, the Cypress subsidiary which produced SPARC, and that Ross's sales increased by almost $5 million in the fourth quarter and beat Cypress's internal forecast by $4 million. (SR 286/6: 165748; 287/4; 165923). As such, Rodgers's statements were true and are unactionable.
 
 
 31
 Appellants maintain that the statements were misleading because Rodgers failed to disclose that Sun was about to produce a new product which would render Galaxy obsolete. (Pl.Br. at 13). However, as the district court properly noted, we presume that investors know the risk of obsolescence of computer equipment because the field is marked by rapid technological advances. Convergent Sec. Litig., 948 F.2d at 513. Thus, Cypress had no duty to disclose the risk that Galaxy might become obsolete. Moreover, Appellants' only evidence that Cypress knew that Galaxy sales would decline because of this new product is a March 1992 memorandum from Ross to Rodgers stating that because of declining Galaxy sales, Ross believed that Sun would not commit to the number of SPARC modules necessary for Ross to meet its second quarter 1992 BOQ. (ER 318:122). This document fails to create an issue of material fact because it relates to Galaxy sales in the second quarter of 1992, while the challenged statements all relate to Galaxy sales in fourth quarter 1991 and first quarter 1992 and because the memorandum originated in March 1992--several months after Rodgers made the challenged statements.
 
 
 32
 In their Second Amended Interrogatory Responses, Appellants also challenge two statements boasting that the Pinnacle, a chip which Cypress was developing during the class period, would attain significant design wins at Sun. (Statements F, R).[2] Appellants implicitly contend that these statements misled the market by implying that Sun would select Pinnacle instead of Viking, a Pinnacle competitor, for its next generation SPARCserver. (Pl.Br. at 13). However, contrary to Appellants' contentions, Rodgers did not state that Sun would select Pinnacle over Viking. Rather, Rodgers stated that even if Sun decided to use the Viking chip in its new SPARCserver, Sun would design Pinnacle into other new products. (ER 280:223; ER 280:266.) As Rodgers stated, Sun eventually did design Pinnacle into its high-end computers. (SR 280: Rodgers Decl. p 72.) That Sun did design Pinnacle into its products indicates that Rodgers's statements were not false when made and were not materially misleading. Syntex Sec. Litig., 95 F.3d at 930-31 (the fact that the FDA approved the defendant's product only three weeks after its patent expired indicated that the defendant's statement that the FDA would approve its product "well in advance of" its patent expiration was neither false nor materially misleading); see also Convergent Sec. Litig., 948 F.2d at 514 (sales predictions were not actionable, in part, because the company missed those projections by only 10%).
 
 
 33
 Moreover, Appellants argue that Rodgers's statements were misleading because at the time that Rodgers purportedly made them he knew that Cypress's relationship with Sun was deteriorating, that Cypress had not been able to produce a working Pinnacle model and that, therefore, Sun would not design Cypress's Pinnacle into its new product. (Id.) However, Appellants mischaracterize snippets from Cypress's internal memoranda and omit pertinent parts of the challenged statements in an effort to create a triable issue with respect to these statements. A review of Appellants' proffered documents in their entirety reveals that none of the internal memoranda and correspondence upon which Appellants rely supports an inference that Sun told Rodgers that it would not use Pinnacle. For example, in December 1991, Rodgers drafted an internal memorandum stating that Sun officers had recently explained to him why Sun "may not use Pinnacle." (ER 318:99). Rodgers drafted this memorandum almost two months after his October 1991 statement, so it does not establish that Rodgers knew that Pinnacle might not achieve design wins at Sun at the time he made the first challenged statement. (Statement F.) Likewise, the December 1991 memorandum does not support an inference that Rodgers's January statement (Statement R) was false or misleading when he made it. The memorandum merely states that Sun officers told him that Sun may not use Pinnacle, not that Sun would not use Pinnacle. (ER 318:99). However, later memoranda and correspondence reveal that Rodgers was involved in ongoing negotiations with these Sun officers to attain a commitment from Sun to use Pinnacle, (ER 318:101-02), and two January 20, 1992 memoranda from Rodgers confirm that Rodgers met with Sun officials. (ER 318:103, 105). Although one of the memoranda indicates that Rodgers was upset about Cypress's performance with Sun because a Sun officer raised it during the meeting, it does not indicate that this performance prevented Cypress from selling Pinnacle to Sun. (ER 318:103-04). Indeed, the second January 20 memorandum is titled "Selling Pinnacle to Sun" and states that "I have gotten Wozniak [a Sun officer] to the point that he agreed he will look at Pinnacle as a viable option." (ER 318:105). The memorandum also states that based on a conversation with another Sun person, John Doerr, two other Sun officers "seem also to be supporters of Pinnacle and concerned about Viking." (Id.) The memorandum concludes by requesting a "major push" to sell Pinnacle to Sun. (Id.) These memoranda and correspondence, when viewed together, do not support an inference that Rodgers's statements at the January 20 teleconference were false or misleading. Rather, they demonstrate that Rodgers's statements were an accurate summary of his negotiations with Sun and expressed his genuine belief that Sun would design Pinnacle into a future product. Appellants point to no other documents or testimony contradicting these documents. Therefore, the district court properly granted summary judgment on these statements.
 
 D. Statements about Backlog
 
 34
 Appellants contend that several statements that Cypress entered the fourth and first quarters with record backlogs, (Statements E, F, R), and statements that Cypress's backlog was "now cleaned and scrubbed" and "much more solid," (Statement H), were misleading because the backlog figures contained double bookings. However, as the district court properly recognized, Appellants have put forth no evidence that the backlog for either the first or fourth quarter contained double bookings. Appellants rely on a memorandum from Lowell Turriff, Vice President for Marketing and Sales, to Rodgers attributing a marketing miss in the third quarter of 1991 to double bookings in the distributors' backlog. (ER 318:42). However, that memorandum states that double bookings affected backlog in the third quarter rather than the quarters at issue. The memorandum also states that the method which distribution used to create its BOQ had been accurate in the past, that distribution had approached marketing with a revised backlog and BOQ forecast accounting for these double bookings, but Turriff rejected the revision and that "[b]arring a market collapse, I do not see another large miss like last quarter." (Id.). Thus, one cannot reasonably infer from this memorandum that Cypress's backlog figures for the first and fourth quarters contained double bookings. The two other memoranda upon which Appellants rely, likewise, fail to support an inference that Cypress knew its fourth and first quarter backlog figures contained double bookings. In fact, neither memorandum even pertains to double bookings. (ER 318:361; ER 318:62).
 
 E. Statements about Production
 
 35
 Appellants challenge several statements pertaining to Cypress's Minnesota manufacturing plant, CMI, and statements about Cypress's overall yields. Specifically, they challenge Rodgers's purported statement to Barron's that CMI exceeded Cypress's expectations by 30 to 40 percent, (Statement B), Rodgers's statement in his December letter to shareholders that CMI "continues its excellent performance" and accounted for 6 percent of Cypress's third quarter revenue, (Statement P), and the company's statement in its 1991 Annual Report that CMI "contributed positively" beginning in the second quarter 1991. (Statement Y). They also challenge remarks that Allen made during the October teleconference, stating that "yields [from Cypress's Texas manufacturing plant] started to improve dramatically" during the third quarter 1991, (Statement F), Goldman's statement that "[h]igher yields in Fabs 2 [Texas] and 3 [Minnesota] contributed to higher output [in the third quarter 1991]," (Statement E), and Rodgers's statement in his December letter to shareholders that "higher yields" in Cypress's Texas and Minnesota plants contributed to higher output. (Statement P).
 
 
 36
 The record indisputably shows that Appellees' statements about CMI were accurate. Graphs distributed to market analysts demonstrate that CMI did contribute 6 percent of Cypress's third quarter revenues and that beginning in the second quarter of 1991, CMI began to contribute revenues to Cypress. (ER 280:305). Appellants point to no evidence in the record to dispute this. Accordingly, summary judgment is appropriate.
 
 
 37
 Likewise, a reasonable fact finder could not infer from Appellants' documentary evidence that Appellees' statements about yields were false or misleading. Status reports prepared by Don Stoops of CTI, (SR 287/3: 71293-96), and Lothar Maier of CMI, (SR 287/3: 71297-98), report that overall yields for the third quarter 1991 improved from overall yields for the second quarter 1991 at both these plants, and Allen testified that yields at both plants improved during the third quarter 1991. (SR 280: Allen Decl pp 24, 25.) In response, Appellants point to an August memorandum from Allen to Rodgers stating that yields on a particular chip at the Texas plant "suck" in comparison to yields on that particular chip at Cypress's San Jose plant, the plant where the chip was originally produced. (ER 318:49). However, that yields on a particular chip were bad at the beginning of August does not reasonably imply that overall yields were bad in October and December--when the challenged statements were made. Indeed, the record suggests that Cypress corrected the August yield problem before the October teleconference. (ER 318:47-48). Likewise, a memorandum from Allen stating that Cypress will not approve capital expenditures which are greater than forecasted revenues for the fourth quarter unless the expenditures are to improve yields does not contradict Appellees' evidence. (ER 318:40). While this memorandum suggests that Cypress was interested in improving its yields in the fourth quarter, that does not reasonably imply that its yields did not improve during the previous quarter. Finally, Appellants point to a September 1991 memorandum from Rodgers to Allen discussing "[s]ome suggestions for your next yield presentation to the Board." (ER 318:72). While that memorandum implies that the Board thought that Cypress should improve its yields, it does not suggest that Cypress was not already improving its yields. Rather, in the memorandum, Rodgers tells Allen, "You've just finished a quarter of substantial effort and major improvements...." (Id.)
 
 F. Statements About Delivery and Testing
 
 38
 Appellants contend that Rodgers's October 14, 1991 statement that Cypress planned to "improve delivery of new products, particularly the time to ramp to volume production" in the fourth quarter, (Statement E), and Rodgers's January 1992 statement that the testing problem which had contributed to the fourth quarter shortfall would be addressed "shortly," (Statements R, S), were misleading. However, the record indisputably shows otherwise.
 
 
 39
 For example, although Appellants point to several documents detailing alleged delivery problems, none of these documents details problems in improving the time that it took Cypress to move a product from ramp to volume production. Moreover, that customers complained to Cypress about delivery problems does not imply that Cypress was not attempting to improve delivery. Indeed, one of the memoranda upon which Appellants rely expressly states that Cypress was improving its delivery. The August 18, 1991 memorandum from Paul Keswick to Rodgers states, "Although transparent to customers, Logic and the Manufacturing groups have made steady improvements in product and delivery performance...." (ER 318:286).
 
 
 40
 Likewise, nothing in the record indicates that Cypress did not address its testing problem "shortly" after Rodgers's January statements. In stating that Cypress would address the test problem shortly, Rodgers stated that the test group would be reorganized in the next week. Both Rodgers and Allen testified that Cypress dismantled the test department and reassigned the test group's assignments to the individual product lines in January. (SR 280: Allen Decl. p 43; SR 280: Rodgers Decl. p 56). Appellants have put forth no evidence to contradict this testimony.
 
 G. Other Statements
 
 41
 Appellants contend that on December 6, 1991, Goldman told Hambrecht & Quist analyst Millard Phelps that Cypress would earn between $75 million and $77 million in revenues for the fourth quarter 1991. (Statement N). The district court properly refused to address this allegation because it was raised for the first time in the Appellants' Second Amended Interrogatory Responses. See infra IV.B. Moreover, Appellants have put forth no admissible evidence that Goldman made the alleged misstatement. Appellants rely on Phelps's December 17, 1991 report predicting $76 million in revenues for Cypress for the fourth quarter 1991 and Phelps's unauthenticated handwritten notes allegedly attributing the remarks to Goldman. However, as discussed supra II.A., both of these documents amount to inadmissible hearsay. Additionally, as evidenced by Goldman's December 12, 1991 status report, stating that "Current Q4 financial forecast very pessimistic--revenue $75.0 M," the record demonstrates that the $75 million projection conformed to Cypress's internal projections. Those projections were reasonably based on Cypress's historically accurate forecasting process, and Appellants have failed to produce evidence suggesting that Cypress's reliance on its internal forecasts was unreasonable or that Cypress failed to disclose adverse facts which would have undermined the accuracy of its forecasts. See supra II.B.
 
 
 42
 Appellants also contend that Alvarez falsely told a group of sales people that Cypress' § 1Meg SRAM would be available in the third quarter of 1991. (Statement C). The product did not become available at that time. However, Alvarez made the statement to an internal Cypress audience, and Appellants have put forth no evidence demonstrating that the information entered the market. Thus, Appellants, who rely on a fraud-on-the-market theory, cannot establish that they relied on this statement. See Apple Computer Sec. Litig., 886 F.2d at 1115.
 
 
 43
 III. Liability for Forecasts and Optimistic Statements in
 
 Analysts' Reports
 
 44
 Appellants contend that Appellees can be liable for projections, forecasts and other information contained in various analysts' reports because the Appellees adopted these forecasts and projections. (Statements G-J, L-M, O, Q, T, V-X). A corporation or its insiders may be liable for analysts' forecasts or projections only if they adopt them by putting their "imprimatur" on the forecast. In re Syntex Corp. Sec. Litig., 95 F.3d 922, 934 (9th Cir.1996); In re Verifone Sec. Litig., 784 F.Supp. 1471, 1486 (N.D.Cal.1992), aff'd, 11 F.3d 865 (9th Cir.1993). This occurs when the corporation "sufficiently entangle[s] itself with the analysts' forecasts to render those predictions 'attributable to it.' " Elkind v. Ligget & Meyers, Inc., 635 F.2d 156, 163 (2d Cir.1980). Entanglement requires a two-way flow of information between the corporate insider and the analyst preparing the challenged forecast. Stack v. Lobo, 903 F.Supp. 1361, 1371-72 (N.D.Cal.1995); see Syntex Sec. Litig., 95 F.3d at 934. Therefore, a plaintiff seeking to hold a corporation or its insiders liable for an analyst's predictions must demonstrate that a corporate insider provided misleading information to an analyst, that the analyst relied on the information and that the insider somehow endorsed or approved the report prior to or after its publication. Stack, 903 F.Supp. at 1372.
 
 
 45
 Here, the district court properly concluded that the Appellants have not raised a triable issue as to whether the Appellees sufficiently entangled themselves with any particular analyst's report. Appellants have failed to put forth evidence that Rodgers or Goldman adopted any of the analysts' reports by reviewing any of the reports after the analysts had drafted them and endorsing the spin the analysts put on the information they received from Cypress or by attesting to the accuracy of any of the analysts' reports. Appellants have produced copies of several of the reports at issue each possessing a facsimile transmission line suggesting that the analysts sent the reports to Cypress. (ER 318:448-56). However, each of these faxed copies indicates that they were faxed after the article was published, and Appellants have offered no evidence that Cypress communicated with the reporters after receiving these copies--let alone evidence that Cypress approved the articles which the analysts sent to it.[3] In fact, both Rodgers and Goldman testified that Cypress maintained an express policy prohibiting officers from commenting on analysts' projections. (SR 280: Goldman Decl. pp 17, 21; SR 280: Rodgers Decl. p 69; SR 350: Goldman Dep. at 338-39; SR 350: Rodgers Dep. at 691). In response, Appellants have offered evidence that Cypress conducted quarterly teleconferences with analysts and that Rodgers and Goldman might have spoken with analysts who contacted Cypress outside of these teleconferences. However, such communications evidence only a one-way flow of information from Cypress to analysts and from the analysts to the market. This type of communication is insufficient to hold a corporation liable for third-parties' optimistic statements and projections. See Syntex Sec. Litig., 95 F.3d at 934 (analysts' reports predicting high earnings unactionable where the reports were the culmination of a "one-way flow of information" from corporate insiders to analysts and the corporation had a no-comment policy).
 
 
 46
 Furthermore, contrary to the Appellants' argument, nothing in the transcript of the teleconferences or Rodgers's deposition testimony suggests that Cypress provided anything more than general factual and historical information about Cypress. For example, contrary to Appellants' characterization, Rodgers's statement during the January 1992 teleconference that "we can work with you to develop numbers over the next few weeks to get your estimates accurate," (ER 280:266), does not indicate that Cypress gave analysts inside financial information. Rather, Rodgers made this statement while answering a question regarding the five investments Cypress made in 1991. (Id.) When the statement is read in context, it demonstrates that Rodgers offered to provide analysts more accurate information about the costs of these investments. Merely providing analysts with historical information and correcting factual inaccuracies is not sufficient to establish entanglement. In re Caere Corporate Sec. Litig., 837 F.Supp. 1054, 1059 (N.D.Cal.1993); see Elkind, 635 F.2d at 163 (evidence that the corporation made suggestions as to factual and descriptive matters did not compel a finding of entanglement where evidence also indicated that analysts knew they were not being made privy to the corporation's internal financial projections).
 
 IV. Other Issues
 A. Rule 56(f) Relief
 
 47
 Appellants raise several other peripheral issues in their brief. None are meritorious. For example, Appellants complain that the district court abused its discretion in denying their Rule 56(f) motion for a continuance because they could not have realized that they needed to depose certain analysts and reporters until Appellees testified at their depositions and raised the hearsay issue in their summary judgment motions. However, Appellants' own affidavit submitted in support of their motion for a Rule 56(f) continuance belies this argument. Appellants' counsel stated in his affidavit that Appellants needed to depose these analysts and reporters to authenticate their handwritten notes and reports and conceded that regardless of Goldman's deposition testimony, "Mr. Goldman would not have been competent to verify handwritten notes that he did not write and does not have personal knowledge of." (Davidovits Decl. p 9). Thus, Appellants should have known that they would need to depose these analysts when they received copies of the handwritten notes pursuant to their own subpoena duces tecum. Appellants received these notes well before discovery closed and Appellees moved for summary judgment. Therefore, we cannot say that the district court abused its discretion in denying as untimely Appellants' motion for a Rule 56(f) continuance and to depose additional witnesses.
 
 B. Second Amended Interrogatory Responses
 
 48
 Similarly, the district court did not abuse its discretion in striking Appellants' Second Amended Interrogatory Responses. Appellants' Second Amended Interrogatory Responses challenged several additional statements from the press releases, teleconferences and documents which contained the statements that Appellants challenged in their Amended Interrogatory Answers. Appellants concede that the amended responses contain only information from documents which Appellants have possessed since the inception of the litigation, (Pl.Br. at 40-41 n. 33), and have offered no explanation why the responses which they filed in December 1994 needed to be amended in April 1995 with information that they possessed when they originally filed their responses. Thus, that the Appellants hoped to challenge these statements in the litigation is the only plausible explanation for the amendments. Therefore, the district court properly construed them as a motion for leave to amend the complaint. We review a district court's order denying leave to amend for abuse of discretion. DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir.1987). Courts should grant leave to amend only if an amendment will not cause prejudice to the opposing party, is not sought in bad faith and is not futile. Id. (citations omitted).
 
 
 49
 Here, the district court found that allowing the Appellants' amendments would unduly prejudice Appellees because Appellants served the amended interrogatory answers after the court closed discovery and after Appellees filed a "very prodigious summary judgment motion" and because allowing the amendments would delay further trial of the case which was "well into its third year" and was set for trial less than three months after the Appellants sought leave to amend. (ER 342:3-4). The court noted that the new statements came from the same documents as the thirty-five statements identified in Appellants' original responses. (Id. at 4). The court found that because Appellants knew about the statements previously, the Appellants exercised undue delay in amending their responses. (Id.) Finally, the court found that Appellants acted in bad faith in seeking to amend because they failed to explain why they had not raised the statements earlier and failed to notify the Appellees of their intention to amend their responses, even though they knew that Appellees intended to move for summary judgment. (Id.) Under these circumstances, the district court did not abuse its discretion in striking Appellants' Second Amended Interrogatory Responses. Kaplan v. Rose, 49 F.3d 1363, 1370 (9th Cir.1994) (denying leave to raise new misstatements where the parties had completed "voluminous and protracted" discovery, trial was two months away and the plaintiffs had known about the two documents containing the new misstatements since the beginning of the litigation), cert. denied 116 S.Ct. 58 (1995).
 
 C. Section 20(a) Claims
 
 50
 The district court granted the Appellants' motion for class certification but held that Frederick Rand ("Rand") could not serve as a class representative because he could not adequately represent the class. (ER 176). Because Rand could not serve as a class representative, the court found that no class representative had standing to assert a claim under Section 20(a) of the Securities and Exchange Act of 1934 and dismissed Appellants' Section 20(a) claims. (ER 250). Appellants contend that the district court abused its discretion in refusing to permit Rand to serve as a class representative and, thus, erred in dismissing their Section 20(a) claims.
 
 
 51
 A district court should not certify a class if a danger exists that absent class members will suffer because the class representative is preoccupied with defenses unique to him. Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir.1992). Here, the district court found that Rand had been involved in seventeen previous securities lawsuits and had an ongoing relationship with Appellants' counsel in this action. (ER 176). The court reasoned that Rand's previous litigation experience, his relationship with Appellants' counsel and the extent of his personal role as opposed to his counsel's role in the litigation raised questions about his ability to represent the class and posed a danger that he might be subject to unique defenses which might preoccupy the litigation. (Id.) Under the circumstances of this case, we cannot say that the court abused its discretion in reaching this holding. Hanon, 976 F.2d at 506-07, 508 (a proposed representative failed to satisfy Rule 23(a)'s requirements because his reliance on the market "would be subject to serious dispute" as a result of his extensive experience in four prior securities suits, his relationship with his lawyers based upon his relationship with them in the previous securities litigation, his practice of buying a minimal number of shares of stock in troubled companies and his unusual purchase of the defendant's stock--he purchased so small an amount that he could not have expected to earn a profit on the sale of it); Hoexter v. Simmons, 140 F.R.D. 416, 422-23 (D.Ariz.1991) (rejecting representatives who served as plaintiffs in "numerous" securities actions and were represented by the same attorneys in each suit because their previous litigation experience subjected them to unique defenses); Shields v. Smith, No. C-90-0349 FMS, 1991 WL 319032, * 4 (N.D.Cal. Nov. 4, 1991) (rejecting representative who consistently purchased stock in troubled companies, had been involved in over two dozen lawsuits, and had purchased stock in the defendant corporation after the corporation disclosed some short-term problems). Because none of the remaining class representatives had standing to assert Section 20(a) claims, the court properly dismissed Appellants' claims. See Sosna v. Iowa, 419 U.S. 393, 403 (1975).
 
 D. Appellees' Arguments
 
 52
 Appellees raise several alternative bases to support the district court's order granting summary judgment. For example, Appellees argue that Allen, Gani, Turriff and North are entitled to summary judgment because they did not make any of the alleged misrepresentations, nor did they influence Rodgers and Goldman, the defendants who allegedly made the identified statements. Because we find that the district court properly granted summary judgment on the bases cited in its opinion, we need not reach the merits of these contentions.
 
 V. Conclusion
 
 53
 For the foregoing reasons, the district court order granting Appellees' motion for summary judgment and dismissing the Appellants' claims, the district court order striking Appellants' Second Amended Answers to Interrogatories and the district court order granting Appellees' motion to dismiss Appellants' Section 20(a) claims are AFFIRMED.
 
 
 
 *
 The Honorable Harlington Wood, Jr., United States Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by the 9th Cir.R. 36-3
 
 
 [1]
 In their various discovery requests, Appellants have lettered each challenged statement. For simplicity's sake, we will refer to the challenged statements by letter as they appear in Plaintiffs' Amended Responses to Defendants' First Set of Interrogatories to All Plaintiffs
 
 
 [2]
 As discussed infra IV.B., the district court did not abuse its discretion in striking the Appellants' amended responses and, therefore, properly refused to consider these statements on summary judgment. However, for the reasons stated above, we find ample bases on the record to support a grant of summary judgment with respect to these statements
 
 
 [3]
 Plaintiffs also point to an affidavit from their expert in which she opines that Appellees "confirmed analysts' expectations" and "convey[ed] a specific earnings range as a base for calculating future earnings." (Preston Decl. p 31). However, the district court struck these portions of the expert's affidavit, and we cannot say that it abused its discretion in so doing. Kisor v. Johns-Manville Corp., 783 F.2d 1337, 1340 (9th Cir.1986). No specific facts in the record support the expert's opinion that Appellees provided a specific earnings range to analysts. See Reynolds v. County of San Diego, 84 F.3d 1162, 1169 (9th Cir.1996) (expert's speculative conclusions which were not supported by facts in the record were insufficient to preclude summary judgment). Additionally, the expert's testimony in effect amounts to testimony that certain conversations between Cypress and market analysts took place. Such testimony is testimony to a fact rather than opinion testimony. Appellants have not produced evidence that the expert was present at any of these alleged conversations between Cypress and the analysts. Therefore, she does not have personal knowledge of these conversations and may not testify to them. Fed.R.Evid. 602